# EXHIBIT A

PHILLIP A. TALBERT
United States Attorney
ROBERT J. ARTUZ
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:18-CR-0033 WBS |
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| WILLIAM LAMAR BLESSETT, | |
| Defendant. | |

## I.  **INTRODUCTION**

**A.**  **Scope of Agreement.**

The Information in this case charges the defendant with a violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) – knowing possession of a visual depiction of a prepubescent minor or a minor who has not attained 12 years of age engaging in sexually explicit conduct, following a prior conviction for a violation of 18 U.S.C. § 2252(a)(4)(B). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  No modification of this plea agreement shall be effective unless it is in writing and signed by all parties.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

/ / /

PLEA AGREEMENT                                                    1

**B.**     **Court Not a Party.**

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the Information.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.     DEFENDANT'S OBLIGATIONS

**A.**     **Guilty Plea.**

The defendant will plead guilty to a violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) – knowing possession of a visual depiction of a prepubescent minor or a minor who has not attained 12 years of age engaging in sexually explicit conduct, following a prior conviction for a violation of 18 U.S.C. § 2252(a)(4)(B).  The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this plea agreement, including the factual admissions set forth in the Factual Basis for Plea attached hereto as Exhibit A, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this plea agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this plea agreement generally.

PLEA AGREEMENT                                2

1        1.      Waiver of Indictment:

2        The defendant acknowledges that under the United States Constitution he is entitled to be

3    indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.

4    P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the

5    charges set forth in the information. The defendant agrees that at a time set by the Court, he will sign a

6    written waiver of prosecution by Indictment and consent to proceed by Information rather than by

7    Indictment.

8        2.      Remand.

9        The defendant acknowledges that the crime to which he is pleading guilty is listed in 18 U.S.C. §

10   3143(a)(2), and he agrees that he will remain in custody upon the entry of his plea.

11   **B.    Restitution.**

12       The defendant agrees the conduct to which he is pleading guilty requires him to pay mandatory

13   restitution to the victims under 18 U.S.C. § 2259. Given that the Court did not award restitution to any

14   victims during the September 2019 judgment and sentencing in this case, see Docket Nos. 83–84, the

15   government agrees that it will not seek or recommend restitution during re-sentencing.

16   **C.    Fine.**

17       The parties agree that a fine is not appropriate in this case.

18   **D.    Special Assessments.**

19       The defendant agrees to pay a special assessment as ordered by the Court at the time of

20   sentencing by delivering a check or money order payable to the United States District Court to the

21   United States Probation Office immediately before the sentencing hearing. The defendant agrees that

22   this special assessment will include:

23       1.      A mandatory special assessment of $100 under 18 U.S.C. § 3013; and

24       2.      A mandatory special assessment of $5,000 under 18 U.S.C. § 3014 if the Court

25               determines that the defendant is a non-indigent person for purposes of 18 U.S.C. § 3014.

26       If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to

27   earn the money to pay the assessment, if necessary, by participating in the Inmate Financial

28   Responsibility Program.

PLEA AGREEMENT                                    3

1    E.    <u>Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).</u>

2    If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw

3    his plea, this plea agreement is voidable at the option of the government. If the government elects to

4    void this plea agreement based on the defendant's violation, the government will no longer be bound by

5    its representations to the defendant concerning the limits on criminal prosecution and sentencing as set

6    forth herein. A defendant violates the plea agreement by committing any crime or providing or

7    procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in

8    any litigation or sentencing process in this case, or engaging in any post-plea conduct constituting

9    obstruction of justice. Varying from stipulated Guidelines application or agreements regarding

10   arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through

11   counsel, also constitutes a violation of the plea agreement. If the defendant violates this plea agreement

12   in any way, the government also shall have the right (1) to prosecute the defendant on any of the counts

13   to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea

14   agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The

15   defendant shall thereafter be subject to prosecution for any federal criminal violation of which the

16   government has knowledge. The decision to pursue any or all of these options is solely in the discretion

17   of the United States Attorney's Office.

18   By signing this plea agreement, the defendant agrees to waive any objections, motions, and

19   defenses that the defendant might have to the government's decision. Any prosecutions that are not

20   time-barred by the applicable statute of limitations as of the date of this plea agreement may be

21   commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

22   limitations between the signing of this plea agreement and the commencement of any such prosecutions.

23   The defendant agrees not to raise any objections based on the passage of time with respect to such

24   counts including, but not limited to, any statutes of limitation or any objections based on the Speedy

25   Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as

26   of the date of this plea agreement.

27   In addition, (1) all statements made by the defendant to the government or other designated law

28   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

PLEA AGREEMENT                                  4

1   whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or

2   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

3   claim under the United States Constitution, any statute, Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, or any

4   other federal rule, that statements made by the defendant before or after this plea agreement, or any

5   leads derived therefrom, should be suppressed.  By signing this plea agreement, the defendant waives

6   any and all rights in the foregoing respects.

7       **F.      Forfeiture.**

8       The defendant agrees to forfeit to the United States voluntarily and immediately all of his right

9   title and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. § 2253.  Those assets

10  include, but are not limited to, the following:

11          1.   Intel Nextbook (IMEI: 359617050754);

12          2.   LG cellphone Model LGMS428 (IMEI 358479074822952);

13          3.   LG cellphone Model LGMS330 (IMEI 357885073094503);

14          4.   Apple iPhone Model A1661 (S/N C39SR0FUHFY4);

15          5.   Apple iPad Model A1674 (S/N DMPRH5KPGXQO);

16          6.   HP laptop (S/N CND6437FVS); and

17          7.   Five AT&T UVerse modems.

18      The defendant agrees that the listed asset constitutes property involved in a violation of 18

19  U.S.C. § 2252(a)(4)(B).

20      The defendant agrees to fully assist the government in the forfeiture of the listed asset and to take

21  whatever steps are necessary to pass clear title to the United States.  The defendant shall not sell,

22  transfer, convey, or otherwise dispose of any of his asset(s), including but not limited to, the above-listed

23  asset.

24      The defendant agrees not to file a claim to any of the listed property in any civil proceeding,

25  administrative or judicial, which may be initiated.  The defendant agrees to waive his right to notice of

26  any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a

27  claim in that forfeiture proceeding.

28      The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of

PLEA AGREEMENT                              5

1   assets. The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses

2   to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense,

3   and agrees to waive any claim or defense under the Eighth Amendment to the United States

4   Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States,

5   the State of California or its subdivisions.

6          The defendant waives oral pronouncement of forfeiture at the time of sentencing, and any

7   defenses or defects that may pertain to the forfeiture.

8                   III.    **THE GOVERNMENT'S OBLIGATIONS**

9          A.    **Dismissals/Other Charges.**

10         The government agrees not to bring any other charges arising from the conduct outlined in the

11  Factual Basis attached hereto as Exhibit A, except if this plea agreement is voided as set forth in this

12  plea agreement generally, or as specifically provided in paragraphs II.E (Violation of Plea Agreement by

13  Defendant/Withdrawal of Plea), VI.B (Stipulated Guideline Calculation), and VII.B (Waiver of Appeal

14  and Collateral Attack) herein.

15         B.    **Recommendations.**

16                1.    Incarceration Range.

17         The government will recommend that the defendant be sentenced within the applicable guideline

18  range (including the application of the mandatory statutory minimum term) as determined by the Court.

19                2.    Acceptance of Responsibility.

20         The government will recommend a two-level reduction in the computation of his offense level if

21  the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §

22  3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of

23  the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

24  in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

25  preparation of the pre-sentence report or during the sentencing proceeding.

26         C.    **Use of Information for Sentencing.**

27         The government is free to provide full and accurate information relevant to the charged offenses

28  and relevant conduct to the Court and Probation, including Victim Impact Statements, and answering

PLEA AGREEMENT                          6

1  any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments

2  by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that

3  nothing in this plea agreement bars the government from defending on appeal or collateral review any

4  sentence that the Court may impose.

5                    IV.    **ELEMENTS OF THE OFFENSE**

6        At a trial, the government would have to prove beyond a reasonable doubt the following

7  elements of the offense to which the defendant is pleading guilty, Knowing Possession of Visual

8  Depiction of a Minor Engaging in Sexually Explicit Conduct:

9        Elements (from Ninth Circuit model criminal jury instruction 20.23):

10  • First, that the defendant knowingly possessed matters that the defendant knew contained a visual
11      depiction of [a] minor[s] engaged in sexually explicit conduct;

12  • Second, the defendant knew the visual depiction contained in the matter was of / showed [a]
       minor[s] engaged in sexually explicit conduct;

13  • Third, the defendant knew that production of such [a] visual depiction[s] involved use of a minor
14      in sexually explicit conduct; and

15  • Fourth, that the visual depiction had been

16      o  mailed, shipped, or transported using any means or facility of interstate commerce in or
17         affecting interstate commerce

18      or

19      o  produced using material that had been mailed, shipped, or transported using any means or
           facility of interstate commerce or in or affecting interstate commerce by any means
20         including by computer.

21        Under 18 U.S.C. § 2252(b)(2), the government would also have to prove that at least one or more

22  depictions involved in the offense involved a prepubescent minor or a minor who had not attained 12

23  years of age.

24        The defendant fully understands the nature and elements of the crimes charged in the

25  Information to which he is pleading guilty, together with the possible defenses thereto, and has

26  discussed them with his attorney.

27  / / /

28  / / /

PLEA AGREEMENT                              7

## V.   MAXIMUM SENTENCE

### A.   Maximum Penalty.

The maximum sentence that the Court can impose is 20 years of incarceration, a fine of $250,000, a lifetime of supervised release and special assessments of $100, and an additional special assessment of $5,000 if the defendant is non-indigent. The mandatory minimum sentence that the Court can impose is 10 years of incarceration. Additionally, conviction on the count charged in the information carries a mandatory minimum of 5 years of supervised release.

By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.   Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years imprisonment.

In certain circumstances, if the defendant is required to register as a sex offender and then commits certain other federal sex offenses, the court may revoke the defendant's supervised release and impose a sentence of incarcerate of at least 5 years. The Supreme Court has held that such a revocation requires a finding by a jury, however, not by a judge.

## VI.   SENTENCING DETERMINATION

### A.   Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists

1  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

2  consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further

3  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must

4  impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

5      **B.**     **Stipulations Affecting Guideline Calculation.**

6      The government and the defendant agree that there is no material dispute as to the following

7  sentencing guidelines variables and therefore stipulate to the following:

| | | | |
|---|---|---|---|
| 1. | Base Offense Level: | | 18 (2G2.2(a)(1)) |
| 2. | Specific Offense Characteristics: | | |
| | Pre-pubescent minor(s): | | +2 (2G2.2(b)(2)) |
| | Material that portrays sadistic or masochistic conduct or other depictions of violence, or portrays sexual abuse or exploitation of an infant or toddler: | | +4 (2G2.2(b)(4)(A) & (B)) |
| | Use of multiple electronic devices: | | +2 (2G2.2(b)(6)) |
| | Over 1,000 child pornographic images: | | +5 (2G2.2(b)(7)(B)) |
| 3. | Adjusted Offense Level: | | 31 |
| 4. | Acceptance of Responsibility: See paragraph III.B.2 above | | |
| 5. | Criminal History: The parties have reached no agreement regarding the defendant's criminal history. | | |

20      The parties agree that they will not seek or argue in support of any other specific offense

21  characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"),

22  or cross-references.  Both parties agree not to move for, or argue in support of, any departure from the

23  Sentencing Guidelines.

24      The defendant is free to move for, and argue in support of, a variance pursuant to 18 U.S.C. §

25  3553(a) and recommend to the Court any sentence that is not less than the mandatory minimum of 10

26  years' incarceration.

27  ///

28  ///

PLEA AGREEMENT           9

## VII.    WAIVERS

### A.    Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B.    Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.  The defendant specifically gives up the right to appeal any order of restitution or special assessment the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case.  The defendant understands that these circumstances occur infrequently and that in almost all cases this plea agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

PLEA AGREEMENT                                         10

1   federal and state sex offender registration requirements, and that those requirements may apply

2   throughout his life.  The defendant understands that he shall keep his registration current, shall notify the

3   state sex offender registration agency or agencies of any changes to defendant's name, place of

4   residence, employment, or student status, or other relevant information.  Defendant shall comply with

5   requirements to periodically verify in person his sex offender registration information.  Defendant

6   understands that he will be subject to possible federal and state penalties for failure to comply with any

7   such sex offender registration requirements.  If he resides in California following release from prison, he

8   will be subject to the registration requirements California Penal Code § 290.  Defendant further

9   understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies

10  upon his release from confinement following conviction.  As a condition of supervised release,

11  defendant shall initially register with the state sex offender registration in California, and shall also

12  register with the state sex offender registration agency in any state where defendant resides, is

13  employed, works, or is a student, as directed by the Probation Officer.  The defendant shall comply with

14  all requirements of federal and state sex offender registration laws, including the requirement to update

15  his registration information.  Defendant shall provide proof of registration to the Probation Officer

16  within 72 hours of release from imprisonment.

17                    VIII.        **ENTIRE PLEA AGREEMENT**

18          Other than this plea agreement, no agreement, understanding, promise, or condition between the

19  government and the defendant exists, nor will such agreement, understanding, promise, or condition

20  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

21  counsel for the United States.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

PLEA AGREEMENT                                      12

**EXHIBIT A  Page 11 of 15**

1   Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

2   attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

3   the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

4   herein.

5   **C.   Waiver of Attorneys' Fees and Costs.**

6   The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

7   119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

8   investigation and prosecution of all charges in the above-captioned matter and of any related allegations

9   (including without limitation any charges to be dismissed pursuant to this plea agreement and any

10  charges previously dismissed).

11  **D.   Impact of Plea on Defendant's Immigration Status.**

12  Defendant recognizes that pleading guilty may have consequences with respect to his

13  immigration status if he is not a citizen of the United States or is a naturalized citizen. Under federal

14  law, a broad range of crimes are removable offenses, including the offense to which the defendant is

15  pleading guilty. The defendant and his counsel have discussed the fact that the charge to which the

16  defendant is pleading guilty is an aggravated felony, or a crime that is likely to be determined to be an

17  aggravated felony under 8 USC § 1101(a)(43), and that while there may be arguments that defendant

18  can raise in immigration proceedings to avoid or delay removal, if the defendant is not a United States

19  citizen, it is virtually certain that defendant will be removed. Removal and other immigration

20  consequences are the subject of a separate proceeding, however, and defendant understands that no one,

21  including his attorney or the district court, can predict to a certainty the effect of his conviction on his

22  immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any

23  immigration consequences that his plea may entail, even if the consequence is his automatic removal

24  from the United States.

25  **E.   Sex Offender Registration.**

26  Defendant understands that by pleading guilty, defendant will be required to register as a sex

27  offender upon his release from prison as a condition of supervised release pursuant to 18 U.S.C. §

28  3583(d). Defendant also understands that independent of supervised release, he will be subject to

PLEA AGREEMENT                                     11

1

## IX.   APPROVALS AND SIGNATURES

2    **A.   Defense Counsel:**

3      I have read this plea agreement and have discussed it fully with my client.  The plea agreement

4    accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to

5    plead guilty as set forth in this plea agreement.

6    Dated:  5/19/2022

7                                                          DOUGLAS BEEVERS
                                                         Attorney for Defendant
8

9

10   **B.   Defendant:**

11     I have read this plea agreement and carefully reviewed every part of it with my attorney.  I

12   understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully

13   understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my

14   case.  No other promises or inducements have been made to me, other than those contained in this plea

15   agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.

16   Finally, I am satisfied with the representation of my attorney in this case.

     Dated:
17
                                                         WILLIAM LAMAR BLESSETT
18                                                       Defendant

19

20   **C.   Attorney for United States:**

21     I accept and agree to this plea agreement on behalf of the government.

22   Dated:                                              PHILLIP A. TALBERT
                                                         United States Attorney
23

24
                                                         ROBERT J. ARTUZ
25                                                       Assistant United States Attorney

26

27

28

PLEA AGREEMENT                                13

EXHIBIT "A" – Factual Basis for Plea

Between in or about April 2017 and October 2017, in the Eastern District of California, the defendant, WILLIAM LAMAR BLESSETT, knowingly and intentionally possessed visual depictions of minors, including pre-pubescent minors, engaging in sexually explicit conduct (as defined in 18 U.S.C. § 2256). Defendant has a prior conviction in this district for violating 18 U.S.C. § 2252(a)(4)(B) (No. 2:06-CR-00389 (E.D. Cal.)) in which judgment was entered on October 8, 2008. Defendant was on federal supervised release when he committed this offense.

In April 2017, Dropbox Inc. reported to law enforcement that a Dropbox online storage account owned by BLESSETT (identified by email account 71upyours@gmail) contained images and videos of suspected child pornography. Federal agents obtained a warrant, searched BLESSETT's Dropbox account, and identified over 100 images and videos of child pornography depicting minors engaged in sexually explicit conduct. BLESSETT downloaded these images and videos from various websites using the Internet and stored them in his Dropbox account. He also knowingly possessed these visual depictions on a computer in Sacramento County, California. One of the images (Photo Feb 07, 11 05 15 PM) is a color image of a 6 to 8-year-old naked boy. There is an adult male wearing only a t-shirt, lying on his back with an erect penis. The adult is holding up the child and it appears the man's erect penis is inside the child's buttocks. Another image (Photo Feb 02, 11 30 04 PM) is a collage of about 65 images depicting child pornography on a green background, with children as young as approximately 6 months old to approximately 10 years old. These visual depictions of child pornography, which were stored in Blessett's Dropbox account, were transported (e.g., copied) to the account using a means and facility of interstate commerce including the Internet, which also affected interstate commerce.

In October 2017, federal agents searched via a warrant BLESSETT's residence in Sacramento County, California. They seized the following electronic devices from the residence: (1) HP laptop (S/N CND6437FVS), (2) Intel Nextbook Tablet (IMEI: 359617050754), (3) LG cellphone Model LGMS428 (IMEI 35847907482952), (4) Apple iPhone Model A1661 (S/N C39SR0FUHFY4), and Apple iPad Model A1674 (S/N DMPRH5KPGXQO). BLESSETT owned, operated, and possessed these devices. Collectively, stored on these devices, BLESSETT knowingly possessed over 1,200 child pornography images depicting minors engaged in sexually explicit conduct. On the iPhone, the defendant possessed an image with the filename 5005_395.JPG (463). This image depicts two naked prepubescent boys approximately 10 years of age. One of the boys has his mouth on the other boy's penis as if performing oral copulation. Also on the iPhone, the defendant possessed a video approximately one minute in length with the filename IMG_0365.mp4. This video depicts a prepubescent boy with and an adult male. The adult's erect penis appears to touch the anus of the child as if to perform anal intercourse. These visual depictions of child pornography, which were stored on one or more of BLESSETT's five electronic devices, where copied onto the devices using material that had been mailed, shipped, or transported in interstate commerce, wherein such copying affected interstate commerce.

BLESSETT also knowingly possessed child pornographic images that displays sadistic or masochistic conduct or other depictions of violence. One image (0244.jpg on BLESSETT's HP laptop) displays a naked prepubescent boy under 12 years of age. The boy's penis is exposed. The boy's ankles are bound with white rope. A black ball appears to be in the boy's mouth secured by a black strap that appears to wrap around his head. BLESSETT also possessed child pornographic videos (e.g., Upgraded.mp4 in his Dropbox account) that displays the sexual abuse of a vulnerable victim, including a toddler. BLESSETT knew or should have known the victim of the offense was a vulnerable victim.

I have reviewed the entire factual basis in Exhibit A above, and as far as my own conduct is concerned, I adopt it as my own statement.

Date: _May 19, 2022_

_____
Defendant, William Lamare Blessett

PLEA AGREEMENT                                    A-1

**EXHIBIT A  Page 14 of 15**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 2:19-cr-00033 WBS |
| | ) |
| WILLIAM LAMAR BLESSETT, | ) |
| *Defendant* | ) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Douglas J. Beevers
*Printed name of defendant's attorney*

_____
*Judge's signature*

William B. Shubb, United States District Judge
*Judge's printed name and title*

**EXHIBIT A  Page 15 of 15**

# EXHIBIT B

Donald Specter (SBN 83925)
  dspecter@prisonlaw.com
Margot Mendelson (SBN 268583)
  mmendelson@prisonlaw.com
Patrick Booth  (SBN)328783
  patrick@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

AARON J. FISCHER (SBN 247391)
  ajf@aaronfischerlaw.com
Law Office of Aaron J. Fischer
2001 Addison Street, Ste. 300
Berkeley, CA 94704
Telephone: (510) 806-7366
Fax: (510) 694-6314

JENNIFER STARK (SBN 267062)
  jennifer.stark@disabilityrightsca.org
Disability Rights California
2111 J St., #406
Sacramento, CA 95816
Telephone: (510) 267-1200
Fax: (510) 267-1201
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, ARMANI LEE, and LEERTESE BEIRGE on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>COUNTY OF SACRAMENTO,<br><br>        Defendant. | Case No. 2:18-cv-02081 TLN KJN<br><br>**CLASS ACTION**<br><br>**STATUS REPORT RE: MONITORING OF CONSENT DECREE IMPLEMENTATION**<br><br>**Judge: Hon. Kendall J. Newman**<br><br>Complaint Filed: July 31, 2018 |

The parties to this matter submit this Joint Status Report to advise the Court on monitoring and implementation activities pursuant to the court-approved Consent Decree. Dkt. No. 85-1.

## I. Remedial Plan Implementation and Compliance Monitoring

The court-appointed Subject Matter Experts and Plaintiffs' class counsel continue to monitor compliance with the Remedial Plan, in accordance with the terms of the Consent Decree. Modifications to the monitoring schedule and procedures have continued to occur as necessary given the exigencies of the ongoing COVID-19 situation. The Subject Matter Experts and Plaintiffs' class counsel also continue to work with Defendant County of Sacramento (the "County"), including the Sheriff's Office and Adult Correctional Health leadership, on several aspects of Consent Decree implementation.

The Subject Matter Experts are currently completing their third monitoring reports on the Sacramento County Jail (the "Jail") and Remedial Plan implementation on Medical Care, Mental Health Care, and Suicide Prevention. These reports shall be submitted to the Court upon completion.

Plaintiffs' class counsel, consistent with their authority under the Consent Decree and their role in monitoring the County's compliance with components of the Remedial Plan pertaining to Restrictive Housing and ADA/Disability, are proceeding with monitoring on those topics, and will submit updated monitoring reports on these topics as soon as completed.

## II. Dispute Resolution on Mental Health and Suicide Prevention Remedial Plan Provisions

On October 29, 2021, Plaintiffs' class counsel sent a Dispute Notice letter to the County demanding specific actions to implement critical remedial provisions regarding Mental Health Care and Suicide Prevention on which the County is not in compliance. Plaintiffs' class counsel notified the designated Dispute Resolution

mediator, Hon. Nathanael Cousins, as to the dispute. The October 29, 2021 Dispute Notice letter is attached as **Exhibit A**.

Since that time, the parties have engaged in extensive negotiations and substantive discussions on (a) the Jail's mental health treatment delivery system, (b) use of force policies and practices as related to class members with disabilities, (c) suicide prevention policies and practices, (d) provision of confidentiality for suicide risk assessments and mental health clinical encounters, and (e) physical plant and staffing issues as they relate to *Mays* Remedial Plan implementation. The Subject Matter Experts on Mental Health Care (Mary Perrien Ph.D.) and Suicide Prevention (Lindsay Hayes) have assisted with this process and provided considerable input.

On May 27, 2022, the parties executed a Memorandum of Agreement that resolves certain issues identified in Plaintiffs' class counsel's October 29, 2021 Dispute Notice. The executed Memorandum of Agreement is attached as **Exhibit B**.

Several issues remain unresolved. As set forth in the Memorandum of Agreement, the parties agree that the County does not yet have a plan for reaching compliance with Consent Decree requirements related to the following issues: (1) remediation of physical plant deficiencies that prevent delivery of adequate health care services; (2) provision of adequate staffing to deliver adequate mental health care services; (3) provision of adequate acute mental health level of care services at a capacity to meet class member needs; and (4) provision of adequate Intensive Outpatient Program mental health level of care services at a capacity to meet class member needs. The Memorandum of Agreement establishes a framework for moving forward on these unresolved issues, including setting timelines by which the County must develop plans on the matters set forth above.

### III.  Sacramento County Assessments on Key Remedial Plan Components

Sacramento County is currently overseeing two assessments relevant to Jail population-related challenges and physical plant deficiencies that are barriers to

successful implementation of the Remedial Plan, as follows:

### A. Jail Physical Plant Deficiencies

The County does not currently have a plan for remediation of physical plant deficiencies that prevent delivery of adequate health care services, among other essential components of the Remedial Plan (*e.g.*, disability accessibility and program access requirements).

Under the Memorandum of Agreement, the County has committed to take interim steps to mitigate physical plant deficiencies, including those that adversely impact mental health care delivery.

The County is now overseeing an assessment of the Sacramento County Main Jail facility and the practicability of implementation of *Mays* Consent Decree requirements. This assessment will include an analysis of the maximum incarcerated population that the Main Jail can support while meeting the terms of the Consent Decree. The County anticipates public release of this assessment report in the coming weeks.

Following completion of this assessment, the County will, by no later than December 1, 2022, develop a plan for remedying physical plant deficiencies that impede Consent Decree implementation, with input from relevant community stakeholders.

### B. Jail Population-Related Barriers to Remedial Plan Implementation

As set forth in the Consent Decree, "population reduction of the jails will facilitate compliance with this Remedial Plan." Consent Decree Remedial Plan Section II.B.1. Jail population reduction measures can and should be "designed to promote public safety through evidence-based programs." Section II.B.2.

The Parties agree that Jail population-related stressors impose substantial barriers to implementation of certain remedial provisions, including provisions

discussed in Plaintiffs' class counsel's October 29, 2021 Dispute Notice.

The County is now overseeing a Jail population assessment that will include policy and program recommendations to reduce the incarcerated population through reducing lengths of stay, bookings, and future jail reoccurrence, including through implementation of community programs.

The parties have agreed that a plan to remediate physical plant deficiencies (discussed above) must be paired with a plan containing Jail population reduction measures, developed with input from relevant community stakeholders, as necessary to facilitate timely, cost-effective implementation of the Consent Decree.

Following completion of this assessment, the County will, by no later than October 15, 2022 and with input from relevant community stakeholders, develop a plan for Jail population reduction measures, to include funding and an implementation schedule for such measures.

### C.    Next Steps Following Sacramento County's Assessment Reports and Plan

As set forth in the Memorandum of Agreement, upon completion of the above-referenced plans, the parties will meet and confer, with the assistance of the Subject Matter Experts and the designated Dispute Resolution mediator, as appropriate, to discuss the adequacy and timeliness of the plan.

The parties may then enter into a supplemental memorandum of agreement on the matters set forth in the October 29, 2021 Dispute Notice or, if a dispute remains, may seek appropriate relief from the *Mays* court.

### IV.    <u>Federal Detainees in the Sacramento County Jail</u>

The County has a longstanding contract with the United States Marshals Service to house approximately 300 federal detainees who are subject to federal criminal proceedings.  Housing these additional 300 federal detainees contributes to Jail population-related stressors that adversely impact efforts to implement the *Mays*

Consent Decree.

On April 15, 2022, Plaintiffs' class counsel sent a letter to Sacramento County leadership calling for an end to the County's contract to house federal detainees in the County Jail facilities. That correspondence is attached as **Exhibit C**.

Sacramento County is currently in communication with the United States Marshals Service about this contract and a plan to reduce the number of federal detainees held in its County Jail facilities. Further information on the matter will be provided to the Court in a future status report.

## V.     Provision of Care to *Mays* Class Members at Experiencing or at Risk of Withdrawal

Plaintiffs' class counsel have raised concerns about the County's practice of detaining new arrivals at the Jail in the Main Jail booking loop for extended periods of time, due largely to lack of space in the Jail's housing units. Plaintiffs' class counsel have raised concerns about conditions in the booking loop, as well as deficiencies in medical and mental health care delivery there.

On March 1, 2022, Plaintiffs' class counsel sent a letter to County leadership calling for immediate action to address issues related to provision of medical care for people experiencing, or at risk of, withdrawal from alcohol, benzodiazepines, and opiates, including during long stays in the Main Jail booking loop. The letter also called for population reduction measures as a means to address dangerous conditions in the booking loop. That correspondence is attached as **Exhibit D**.

Since the transmission of this letter, the parties have conferred, with the participation of the Subject Matter Experts, and the County has taken steps aimed at addressing the issues identified by Plaintiffs' class counsel. The County is conducting audits and providing periodic reports to Plaintiffs' class counsel and the Subject Matter Experts on the provision of care to people experiencing, or at risk of, withdrawal. The County did not expand its population reduction or early release

measures.  This issue will continue to be monitored through *Mays* monitoring procedures.

## VI.   <u>Conclusion</u>

The parties do not request an order from the Court at this time.  The parties will submit further status reports with the completion of the forthcoming monitoring reports, and as warranted to keep the Court informed on progress with respect to Consent Decree implementation.


Respectfully submitted,


Dated: June 3, 2022          */s/ Aaron J. Fischer*_____
Aaron J. Fischer
LAW OFFICE OF AARON J. FISCHER
Attorney for Plaintiffs



Dated: June 3, 2022           */s/ Margot Mendelson (as authorized 6/3/22)*
Margot Mendelson
PRISON LAW OFFICE
Attorney for Plaintiffs



Dated: June 3, 2022           */s/ Rick Heyer (as authorized 6/3/22)*_____
Rick Heyer
SACRAMENTO COUNTY COUNSEL
Attorney for Defendant

# EXHIBIT A

*Via Email*

October 29, 2021

Rick Heyer
Supervising Deputy County Counsel
County of Sacramento

Ann Edwards
County Executive
County of Sacramento

Matthew Petersen
Chief, Correctional Services
Sacramento County Sheriff's Office

Sandy Damiano, Ph.D.
Deputy Director, Primary Health Division
Department of Health Services
County of Sacramento

Jerry W. Elder
Chief Administrative Officer
Psychiatry and Behavioral Sciences, UC Davis

**Re:    Notice of Dispute**
       **Demand for Remedial Action: Mental Health Care, Suicide Prevention**
       *Mays v. County of Sacramento* **(E.D. Cal., No. 2:18-cv-02081-TLN-KJN)**

Dear Mr. Heyer, Ms. Edwards, Chief Peterson, Dr. Damiano, and Mr. Elder:

As class counsel representing the people in custody in Sacramento County Jail facilities (the "Jail") in *Mays v. County of Sacramento*, we write to communicate our serious concerns regarding the County's ongoing failure to comply with critical mental health care and suicide prevention requirements of the *Mays* Consent Decree.  Given the County's failures, we write pursuant to Paragraphs 32-34 of the Consent Decree to give notice of our initiation of the Dispute Resolution process.

In the first round monitoring reports (filed Jan. 20, 2021), the court-appointed experts found that the County was not in compliance with nearly all mental health care and suicide prevention provisions of the Consent Decree.  To assist the County in the task of implementation, the experts identified "focus areas" – that is, issues that are urgent to class member well-being, are of "critical importance" to broader compliance efforts, and in some cases, would be "relatively easy to resolve" with sufficient attention.

The second round monitoring reports (filed Oct. 4, 2021) make clear that insufficient progress has been made on these identified focus areas.[1]  Our clients face serious and unacceptable harm as a result.

---

[1] Mental Health Expert's Second Round Report of Findings, Mary Perrien, Ph.D., Docket 149-2 ("Mental Health Report"); Second Monitoring Report of Suicide Prevention Practices, Lindsay M. Hayes, Docket 149-3 ("Suicide Prevention Report").

We include as a recipient of this letter UC Davis, the long-time County contractor for Jail mental health services (called Jail Psychiatric Services or "JPS"). Monitoring has confirmed an "absence of [] urgency" by JPS to provide constitutionally adequate care to all people with serious mental health needs. Mental Health Report at 3-5. To date, JPS has failed to produce a coherent plan for meeting its constitutional and judicially mandated obligations to provide adequate care. This cannot continue.

While UC Davis/JPS is not currently a named defendant in the *Mays* lawsuit, they have become a substantial impediment to effective implementation of core *Mays* Consent Decree provisions. Sacramento County is responsible for compliance with the *Mays* Consent Decree and relevant constitutional and legal requirements, and it must ensure sufficient oversight of its mental health care contractor in order to meet those obligations.[2]

Affirmative steps must be taken *without delay* to implement foundational remedial provisions in the *Mays* Consent Decree. Plaintiffs' class counsel is prepared to proceed as necessary to protect the rights and well-being of *Mays* class members.

## I.  MENTAL HEALTH CARE

### A. Focus Area #1: Address the Enormous Physical Plant Deficiencies that Impede Remedial Plan Implementation

The lack of adequate space to house and treat class members with mental health needs remains a primary obstacle to provision of constitutionally required care and Consent Decree compliance. The County must address this pervasive deficiency, both to mitigate harms now and to achieve a durable remedy in the future.

The Jail's **inpatient mental health unit** (Main Jail's "2P" unit) was never designed to provide acute mental health care and is poorly maintained, as demonstrated by the "overall lack of cleanliness and physical plant deterioration." Mental Health Report at 12-14. The 18-bed unit lacks space for group therapy or confidential individual treatment. Dr. Perrien poignantly states in her report that the unit looks and feels more like a solitary confinement unit than an inpatient treatment unit. *Id.* at 14. Adding to the problem is that there are regularly as many as 20 people on the acute care waitlist at a given time (most waiting several days for admission), an intolerable delay to access care.

---

[2] We are considering all available legal avenues to ensure compliance, including seeking to add UC Davis/JPS as a party in this case. *See, e.g.*, *Coleman v. Schwarzenegger* Order, Docket 1855, Case No. S-90-0520 LKK JFM (E.D. Cal. Jun. 28, 2006) (adding director of Department of Mental Health (now "DSH") as a defendant in prison class action based on Department's "critical role in creating sustainable and effective solutions for inpatient care" and its "failing to address specific court-ordered remedies," making judicial supervision necessary to "insure an effective remedy in th[e] case").

Dr. Perrien concludes unequivocally: "Achieving Consent Decree compliance will not be possible if 2P remains the inpatient service unit." *Id.* at 15.

The space available for the **Intensive Outpatient Program (IOP) unit and other mental health programs** at the Main Jail is also "quite problematic." According to Dr. Perrien, the deficiencies in space means that "actual treatment cannot be implemented," and delivery of care is "compromised by the lack of confidentiality." Mental Health Report at 16. Similar space deficiencies persist at RCCC as well. *Id.* at 18.

The space available for **mental health and suicide prevention assessments of newly booked people** is also entirely deficient, with no possibility of confidentiality for patients to disclose extremely important and sensitive health care information. Mental Health Report at 16; *see also* Suicide Prevention Report at 26 (noting that intake screening "remains dysfunctional and very problematic" and that the County "remains in Non-Compliance" due in part to space deficiencies).[3]

**The space deficiencies at the Jail are well known and longstanding, and there must be a plan to remedy those deficiencies.** The County has previously developed construction plans at RCCC and the Main Jail to address the deficiencies identified in the *Mays* case. In November 2019, the County abandoned a plan for facility improvements at RCCC. Plans to fund the initial design stage of a "Main Jail Annex" next to the current Main Jail facility were abandoned earlier this year. The County has represented that renovations to the current Main Jail facility would involve "very high costs" and "significant time to complete the work." 3/10/21 Agenda, *Letter to Board of Supervisors re: Workshop – Review the Design-Build Process Related to the Correctional Health and Mental Health Services Facility Project* at 2. Thus, at present, there is no clear plan or path for the County to comply with Consent Decree provisions related to the substantial physical plant deficiencies that exist.

To date, the County also has failed to implement durable jail population measures to mitigate space deficiencies in the Jail. A meaningful commitment by the County to maintain and build on the Jail population reduction that was achieved during the pandemic, for example, would create opportunities to make progress towards an adequate, cost-effective, and time-efficient remedy. As the parties jointly set forth in the Consent Decree, "population reduction of the jails will facilitate compliance with this Remedial Plan." Remedial Plan Section II.B.1. Opportunities for substantial population reduction are available. *See* The Carey Group, *Sacramento County Consultant Report on*

---

[3] The medical care experts have reached a similar conclusion: "We affirm that the current space at Main and Branch Jails is completely inadequate to meet the serious medical needs of the population. Lack of space has contributed to the many cell-side assessments – which compromises confidentiality and health care delivery – and likely to preventable hospitalizations and deaths." Medical Care Report at 10.

*Jail Alternatives*, May 29, 2020 (estimating a potential "mid-range reduction" of 20% of the incarceration rate through proposed initiatives).

We are aware that the County is currently gathering input from its consultants as to what can be done at the Main Jail to meet the terms of the Consent Decree, as well as consideration of what reduction to the present incarcerated population may be necessary to achieve compliance. We also understand that the County is gathering external input as to concrete measures to safely reduce the Jail population. This work is essential and overdue, and must be pursued expeditiously.

### B. Focus Area #2: Remedy Extreme Staffing Deficiencies that Undermine Care

For years, Sacramento County Jail has been plagued with insufficient mental health staffing. As part of the Consent Decree, the County and JPS have committed to providing sufficient staff to deliver necessary mental health care and fulfill the requirements of the Remedial Plan.

While some JPS mental health care positions have been added, there remain critical and glaring gaps. These gaps include insufficient staffing (1) to provide adequate acute care to patients; (2) to provide necessary treatment to patients across the continuum of care; (3) to conduct Consent Decree-mandated treatment team meetings for patients; and (4) to complete Mental Health Evaluations for people with mental health and/or intellectual disabilities who face disciplinary measures or restrictive housing placement. Mental Health Report at 21, 42. These staffing deficiencies must be addressed.

Mental health staffing deficiencies are a barrier to implementation of key Remedial Plan provisions. As just one example, insufficient JPS staffing has prevented implementation of the Mental Health Evaluation process for the Jail disciplinary process.[4] Approximately three years ago, JPS leadership developed a protocol and form for this essential component of the Remedial Plan (Section V.A & Exhibit A-3 (JPS-Rules Violation Mental Health Review)). But JPS has not allocated staffing to implement the protocol. Meanwhile, scores of class members identified as having serious mental health needs remain in restrictive housing placements, including dozens requiring the highest levels of care. Mental Health Report at 42 (point-in-time data showing 58 class members with mental illness in Main Jail's Administrative Segregation/Disciplinary Detention unit 8W, including 33 designated at the either of the two highest levels of mental health need).

---

[4] The *Mays* Consent Decree requires that the County's disciplinary process "meaningful[ly] consider[] the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and wellbeing of prisoners with disabilities." Remedial Plan Section V.A.1; *see also* Section V.B.4.

The results are both predictable and unacceptable. We have observed cases in which class members with serious mental illness or intellectual disabilities have been punished – including through lengthy solitary confinement placements – for incidents such as a refusal to take a medication based on concerns about side effects, inability to keep one's cell clean, a refusal to return an extra shirt to a deputy, and a refusal to participate in a mental health contact where the deputy demanded the patient sit on the dayroom floor to receive mental health care. In short, because JPS has failed to allocate staff to fulfil this critical component of the Remedial Plan, people with mental health and intellectual disabilities are being punished for their disabilities in ways that worsen their mental health conditions.

We demand that the County complete a robust staffing analysis and ensure that there is a staffing plan sufficient to meet all Consent Decree requirements. Attention must be paid to space deficiencies that stand to impede the delivery of care even with sufficient staffing. As discussed below, there must also be sufficient custody staffing to facilitate the provision of mental health care.

### C. Focus Area #3: Provide Adequate and Timely Treatment to Class Members with Mental Health Needs

#### 1. The Long-Operating, Deficient Acute Care Program Must Be Fixed.

Until there is a durable solution to the issue of inpatient mental health capacity, space, and programming, the County will never reach compliance with the *Mays* Consent Decree. The current 18-bed "inpatient unit" (2P) is poorly maintained, physically deteriorating, and lacks space for necessary group therapy and confidential individual treatment. The unit looks and runs more like solitary confinement unit than a treatment setting. The program is entirely unequipped to provide adequate inpatient care for complex patients. For these reasons, Dr. Perrien's report concludes that "[a]chieving Consent Decree compliance will not be possible if 2P remains the inpatient service unit." Mental Health Report at 15. The County has indicated that these issues have been "looked at over the years," with no action taken. Mental Health Report at 10.

The unit not only fails to operate as a legitimate inpatient psychiatric unit, but also is far too small to meet the needs of the Jail population. There are regularly as many as 20 people on the acute care waitlist at a given time, causing an intolerable delay to access care. This shortfall is well known to the County. In 2016, the County's jail mental health consultant noted that the County needs approximately 40 certified inpatient beds to serve the Jail population. *See* Evaluation of Mental Health Services: Sacramento County Jails at 59, *Mays* Docket 1-3. Five years later, there has been no plan or action to expand the capacity of the acute care unit.

Importantly, Dr. Perrien finds that there is no alternative space at the Jail that "offer[s] a positive therapeutic milieu with appropriate confidential treatment space" to serve as a Consent Decree-compliant acute care unit. Consequently, **the current acute**

unit (2P) must be shut down and replaced with alternative methods to deliver
inpatient care, including in community facilities. As noted by Dr. Perrien, the
"County must seriously review what access to inpatient care may be available in the
community and attempt to contract inpatient services with appropriate housing that are
not inside of the jails." Mental Health Report at 19. Options can include utilizing UC
Davis psychiatric facility beds through an amended contract, identifying another private
facility to provide contracted mental health beds, or utilizing Sacramento County mental
health beds.

We are aware that the Sacramento County Mental Health Treatment Center
(SCMHTC) provides 50 inpatient beds to people requiring inpatient mental health care.
The capacity was twice as large until the County's dramatic budget cuts in 2008-09. The
County should seriously consider whether utilization of some bed capacity at SCMHTC
(or another existing facility) could serve *Mays* class members, particularly those with a
lower security profile. Such a strategy would be far more cost- and time-effective than
engaging in new jail construction to meet the inpatient bed demand.[5]

It is intolerable and unconstitutional to deny people in psychiatric crisis timely
access to acute levels of mental health treatment. The County must take immediate
action to mitigate the harms of its longstanding inadequate acute care program at the Jail,
and at the same time actively pursue a path to full and durable Consent Decree
compliance.

    **2.**    ***The Intensive Outpatient Program (IOP) Created as Part of the Mays
Settlement Must Deliver on Its Promise of Serving All Who Require
IOP Level of Mental Health Care.***

The creation of the Intensive Outpatient Program (IOP) was a foundational
component of the Consent Decree in this case. IOP units are meant to provide an
appropriate step-down unit for patients discharging from an acute level of care and to
provide increased treatment to patients at risk of decompensation. Patients must receive
at least ten hours of structured treatment per week, with clinical case management and
robust treatment planning.

The County is not providing class members timely access to IOP level of care
when clinically indicated. Dr. Perrien noted a waitlist of 19 people waiting for IOP
admission. Six had been waiting for more than one month and one person had been
waiting for 80 days. Mental Health Report Appx. C. (Staggeringly, another 107 people
were on the waitlist for Jail-Based Competency Treatment and another 84 people were on
the waitlist for transfer to a Department of State Hospitals program.)

Moreover, class members with serious mental illness are still routinely denied
referral to IOP, because the existing IOP units are not designed to provide care to people

---

[5] Several Northern California counties provide inpatient care to jail detainees in psychiatric
settings outside of the jail – for example, Alameda, Marin, San Francisco, Sutter, and Yuba.

with high security factors. This must be addressed. *See* Remedial Plan Section IV.F.4 ("The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population.").

Waitlists for treatment undermine the system of care. Delays to access care lead to the intolerable situation of people decompensating unnecessarily and, in particular, having restrictive housing units filled with people with serious and immediate mental health needs, a clear violation of the Consent Decree prohibition on the use of restrictive housing for this group. *See* Remedial Plan Sections IV.F.4 & 5, VIII.D.1.

IOP capacity must match the need for such care, and timely access to the IOP program is essential in order for the County to achieve compliance with the Consent Decree's prohibition on the placement of people with mental health needs in restrictive housing units.

### 3. *The County Must Address Custody Staff Shortages Affecting Mental Health Care and Custody Interference with Treatment.*

The County also must take immediate action to remedy custody-related obstacles to mental health care. The Consent Decree explicitly requires that custody staff fulfill their role to facilitate timely access to adequate care for people requiring mental health treatment. Remedial Plan Section IV.F.6.

The experts have found that custody failures undermine delivery of mental health care, identifying several examples where patients were denied confidential clinical contacts due to custody staff "unavailability" or other custody-related issues. Suicide Prevention Report at 32-33, Mental Health Report at 24.

One glimmer of progress this year – the addition of group therapy on the acute mental health unit – has been undercut by custody staffing failures. We have reviewed records showing that group treatment sessions in the acute unit have been cancelled "due to custody shortage and unavailability."

Active custody interference with treatment is also a problem that must be addressed immediately.

We have received reports from people with serious mental health needs in the restrictive housing units (again, a placement that violates the Consent Decree) regarding custody staff failing to respond to emergency requests for help when they are experiencing mental health distress. And as discussed in Part II, below, custody staff also fail to implement clinical orders regarding property and privileges to people on suicide precautions. They have also disrupted treatment by, for example, forcing a patient to sit on the floor for a clinical contact and responding punitively when the patient declined to participate.

#### 4. *JPS's Flawed Mental Health Levels of Care System Must Be Replaced.*

It is well established that JPS's system for identifying patients' mental health care needs has failed and must be replaced.

JPS's "FOSS levels" have proven problematic and ineffective for Remedial Plan implementation efforts. According to Dr. Perrien, they "do not map well onto the acuity of a patient nor onto existing treatment programs. They also do not address treatment planning" or the "levels of mental health care which have specific timelines and expectations associated with them" in the Consent Decree. Mental Health Report at 38-39.

FOSS levels are not a professionally validated or recommended system, and appear to be unique to JPS's program at Sacramento County Jail. For the County and JPS to reach compliance, they will need to re-examine, and then substantially refine or replace, the FOSS levels system to ensure effective implementation of Consent Decree requirements. This too is overdue and readily achievable.

### D. Focus Area #4: Reform Use of Force Policies and Practices Impacting Class Members with Disabilities to Comply with Consent Decree Requirements.

We are aware of multiple class members with serious mental health needs who have recently been subjected to uses of considerable force and full-body restraints, without adequate involvement of mental health staff before, during, or after the incident.

For example, class counsel recently highlighted a troubling use of force against a class member with serious mental illness and a history of severe self-harm and suicide attempts in custody. The incident began when the class member requested mental health care for escalating anxiety and depression. Custody staff informed him that his only option to receive mental health care was to do so while seated on the floor of the dayroom in his housing unit, in plain sight and earshot of the entire housing unit and multiple deputies. When he protested, deputies unnecessarily antagonized and threatened him. They then tore through the belongings in his cell under the auspices of a cell search while he stood cuffed against a wall watching. Once the class member returned to his cell, he refused to submit to removing his cuffs. Rather than involve mental health in de-escalation efforts or give the class member (who was alone in his cell) an opportunity to cool down, the deputies entered the cell, forcibly removed him, and placed him in a restraint device. The incident was harmful and avoidable, and it demonstrated a profound disregard of the man's mental health needs.

The County has not implemented Consent Decree requirements designed to avoid or mitigate uses of force against people with mental health or intellectual disabilities. Jail staff must utilize de-escalation methods, implement specific use-of-force protocols that account for disability needs, and use a "cooling down period." Mental health staff must

provide structured interventions to pursue de-escalation and resolutions without use of force whenever possible.  Remedial Plans Sections V.D.2-7.

Adult Correctional Health (ACH) has recently provided draft Use of Force and Use of Restraint policies.  We and the court-appointed experts have reviewed those drafts and are currently meeting with relevant custody and health care leadership to address concerns and chart a path forward.  Resolution of this focus area will require not only substantial changes to policy but also robust staff training, culture change, and mechanisms for accountability.

Effective implementation will require the commitment of staff and leadership from the Sheriff's Department as well as from JPS and ACH.

## II.  SUICIDE PREVENTION

### A.  Focus Area #1: Develop Compliant Suicide Prevention Policies

The first focus area identified by suicide prevention expert Lindsay Hayes was revision of the Jail's suicide prevention policies.  The parties have finalized the ACH suicide prevention policies; timely and effective implementation is now essential.

The monitoring experts have found repeated instances of staff – in many cases, JPS staff – not being aware of or following existing policy.  Dr. Perrien noted earlier this year that a "troublesome aspect" of her monitoring was that staff was not adhering to existing policies: "Policies can be re-written, but supervisors must ensure that staff adhere to those policies."  First Report of Compliance in Mental Health Services Based on Consent Decree at 7, Docket 136-2.  This is a critical opportunity for JPS and Sheriff's Department staff to demonstrate their commitment to bringing their practices into compliance with the Remedial Plan and the Constitution.

### B.  Focus Area #2: End Overuse and Unnecessary Use of Safety Smocks

The second suicide prevention focus area addresses necessary changes to the use of "safety smocks," sometimes called "safety suits."  *See* Remedial Plan Sections VII.B.5, M.2, & N.1-7.

At present, class members identified as at current risk of suicide are stripped of all clothing, including underwear, and given only a safety smock made of heavy, tear-free material fastened with straps or Velcro.  The garment is open at the bottom and on the sides.  While the suicide smock is a suicide prevention tool (its structure and thickness prevent it from being used as a makeshift noose), the *Mays* Consent Decree and modern practice demand that it *not* be used beyond what is clinically necessary.  The safety smock leaves a person physically exposed without modesty, is uncomfortable, and provides little warmth.  The unnecessary use of safety smocks is cruel, humiliating, and counterproductive; people who are suicidal will deny or refuse to report suicidal thoughts for fear of being put in a safety smock, which at the Jail can last for days at a time.

Despite the relatively discrete and critically important nature of this issue, the experts found that there has been no progress towards compliance in 2021, with continued unnecessary and deeply harmful use of the safety smock, in violation of the *Mays* Consent Decree. These failures must be addressed without any further delay.[6]

Mr. Hayes provides specific examples of safety smock misuse in the SITHU/safety cells and attributes the failure in significant part to **custody staff**. In one case (identified as Case No. 5), Mr. Hayes observed a patient on suicide precautions who had been in a safety smock for four days. Even after the clinician specifically notified custody that clothing should be restored, custody staff failed to do so. Suicide Prevention Report at 63.

Dr. Perrien found deficiencies with respect to safety smocks in the acute unit, attributing the failure in significant part to **JPS mental health staff**. She documented that people "continued to be regularly restricted to a suicide resistant smock . . . by psychiatry beyond what appeared to be clinically indicated. Progress notes did not consistently renew those orders nor were there clinical justifications for those restrictions." Mental Health Report at 45.

This issue can and must be resolved very quickly, but it will require attention, training, and quality assurance from custody, ACH, and JPS. Compliance requires, among other things, that (1) decisions about the use of a safety smock or removal of normal clothing be made by mental health staff based on individualized clinical judgment, (2) mental health staff determine a patient's need for a safety smock at the initial suicide precautions evaluation and *at least* daily thereafter, and (3) provision of regular clothing occur "as soon as clinically appropriate. Remedial Plan Section VII.N. JPS mental health staff must fulfill their duties, and custody staff cannot ignore or undermine appropriate clinical orders.

## C. Focus Area #3: Address Inadequate Privacy/Confidentiality

The third suicide prevention focus area addresses the requirement for reasonable privacy and confidentiality during the intake and suicide risk assessment processes. Remedial Plan Sections C.2, D.1, K.3. The County has failed to make progress on this critical issue. As noted above, full compliance with these provisions will require substantial modifications to the Jails' physical plant. But the County has failed to implement "immediate, interim measures" to improve privacy and confidentiality. Suicide Prevention Report at 7.

---

[6] Misuse of the safety smock was a core deficiency that the *Mays* lawsuit sought to remedy. *See Mays* Complaint at 106 ("Defendant uses safety suits indiscriminately and for excessively long periods of time, in some cases several months. In addition, Defendant forces some people to wear safety suits – with no other clothing, including underwear – even after they are no longer suicidal, a degrading and punitive practice.").

To the contrary, health care staff still routinely conduct non-confidential, cell-front suicide risk and related assessments. This places class members in a terrible position of having to disclose private information in front of deputies and other incarcerated people in order to seek the help they need. The County has failed to take even basic interim steps, such as fixing the inoperable telephone inside the designated JPS Interview Room in the Main Jail's booking area and developing additional privacy booths for intake nursing staff. Suicide Prevention Report at 33. These failures are inexcusable and demonstrate a lack of urgency about important issues affecting the health and well-being of class members.

### D. Focus Area #4: End Reliance on CCTV Observation for Class Members on Suicide Precautions

JPS has failed to remedy longstanding defects in its practices for monitoring people on suicide precautions. In two consecutive reports, Mr. Hayes has called on the County to stop relying on CCTV surveillance in place of in-person observation. This is because too often, video feeds are not adequately watched, leading to suicides and serious suicide attempts being caught on video without timely intervention.

Although the Consent Decree requires an end to the practice and although Mr. Hayes noted that JPS "can quickly come into substantial compliance through policy revision," the problem persists. Of particular concern, JPS leadership appears to be unaware of the persistence of these bad practices; they report that the problem has been resolved despite documented examples to the contrary. *See, e.g.*, Suicide Prevention Report at 54.

The County is on clear notice that its suicide observation practices are deficient and dangerous. The failure to remedy this issue immediately violates the Consent Decree, puts class members at risk of great harm and even death, and exposes the County to significant liability in the event of an in-custody death that could have been prevented through this straightforward change to practice. The inclusion of CCTV monitoring in JPS/ACH clinical orders should cease immediately.

### E. Focus Area #5: End the Improper Denial of Privileges and Property During Suicide Precautions

The fifth focus area addresses the inappropriate denial of property and privileges to people on suicide precautions. Remedial Plan Sections VII.M.1-3. The County's failure to demonstrate meaningful progress towards compliance results in severe and indefensible harms to class members every day.

The Consent Decree requires that mental health staff have the primary responsibility to determine, based on individualized clinical judgment, the removal and return of (1) routine privileges (*e.g.*, visits, telephone calls, recreation) and (2) clothing and possessions (e.g., books, slippers/sandals, eyeglasses) (M.1 & M.2). Any denial of

these privileges or property must be "documented with clinical justification" and "reviewed on a regular basis." The Remedial Plan states that "[c]ancellation of privileges should be avoided whenever possible and utilized only as a last resort" (M.3). In other words, people who are requiring mental health care should not suffer the deprivation of basic items and privileges unless strictly necessary from a clinical perspective.

Here too, the County has failed over the course of two monitoring periods to make changes that would "quickly [facilitate] substantial compliance" with the Consent Decree. Suicide Prevention Report at 7. Instead, the Jail's practices have been defined by inconsistency and dysfunction across the custodial and health care disciplines.

Mr. Hayes found that people on suicide precautions continue to be categorically denied routine **privileges**, including visits, showers, phone calls, and out-of-cell time, as well as access to the courts. Suicide Prevention Report at 58, 64. He found that all people on suicide precautions in safety or SITHU cells "were always locked down." *Id.* at 47, 59.

Staff also continue to indiscriminately deny personal **property** to people on suicide precautions, in clear violation of the Consent Decree. In one recent example, a deputy rejected out of hand a clinician's attempt to provide a book and word search game to a person on suicide precautions. Suicide Prevention Report at 61 (when JPS clinician removes patient from suicide precautions and attempts "to provide him with a book and word search game, a deputy interceded and said 'No.'"). As discussed in Part II.B, above, the blanket denial of clothing to people on suicide precautions also persists.

Mr. Hayes' report describes the resulting significant and altogether unnecessary harm to specific class members. To recount just one example, Mr. Hayes observes one man (Case No. 2) to be "very depressed, teary-eyed, and frustrated that he had been clothed in a safety smock for five days and prohibited from having a shower and shave. He was concerned about his appearance for an upcoming court hearing. The inmate complained that 'they don't let me out for anything.'" After discussion with Mr. Hayes and a JPS supervisor, the clinician found that the man was clinically ready to get his clothes back and a shower. The next day, Mr. Hayes again observed the patient, who had a "brighter affect[] than the day before" and "was grateful that he had his clothes and, although he had not yet received a shower or shave, was looking forward to his scheduled court hearing the following day." Staff reported that this was the first time in *at least three years* that a class member on suicide precautions in the SITHU was allowed clothing. Suicide Prevention Report at 59-60.

The failures lie with both custody staff and JPS mental health staff. Mr. Hayes stated that the "blanket denial of such routine privileges by deputies, as well as the lack of documentation by JPS clinicians in recommending both clothing and privileges when appropriate, continues to be very problematic." Suicide Prevention Report at 61-62.

**JPS mental health staff and leadership** have failed to take steps towards implementation, in terms of both training and practice. Mr. Hayes found that JPS

clinicians were unfamiliar with Consent Decree requirements on the privileges and property issue, and wrongly stated to him that "clothing issue and privileges were the sole discretion of the deputies, not JPS." Hayes Report at 59. Dr. Perrien noted that, in the acute mental health unit, "the primary issue appeared to be that the psychiatrist continued to refuse those items to the [] patients who requested their clothes back or reading materials but the psychiatrist would not allow it nor provide a clinical rationale for that decision." Mental Health Report at 45.

**Custody staff and leadership** have similarly failed to conform their practices to their legal and constitutional obligations. The aforementioned example of a deputy categorically and reflexively refusing to allow a class member to receive a book and word search game from a clinician is troubling. Another deputy, misinformed on Consent Decree requirements and appropriate suicide prevention practice, "freely admitted that they did not believe suicidal inmates should be permitted to attend court hearings or receive telephone privileges because such activities might result in bad news" that could cause the person to attempt suicide. (Mr. Hayes clarified that the staff had it backwards, noting that the "most ideal time to receive any potentially bad news would be while the inmate was still being observed on suicide precautions.") *Id.* at 47. These findings suggest a troubling lack of accountability and knowledge about the Consent Decree.

The County – including JPS – must develop and implement a corrective action plan to achieve compliance now, through issuance of policies and departmental memoranda, provision of targeted training across both custody staff and JPS mental health staff, and effective supervision/quality assurance procedures. Progress toward compliance must happen without delay, including as follows:

1. Class members on suicide precautions, regardless of location, must be provided routine privileges and property consistent with *individualized* clinical judgment, with custody consultation as warranted. Such privileges must include (a) social and legal visits, (b) telephone calls, and (c) out-of-cell activities (dayroom, outdoor recreation, *etc.*).

2. Property must be provided as soon as clinically appropriate, consistent with individualized security considerations, including books, games/activities, writing implements (pen/pencil and paper), tablets, clothing, slippers/sandals, eyeglasses, toothbrush, deodorant, *etc.*

3. All people on suicide precautions should be allowed to attend their court hearing unless the clinician, based upon clinical judgment and in consultation with security staff, determines that transportation to court would adversely impact the individual.

4. Health care and custody policies must be revised consistent with the above, making explicit that these requirements apply to people on suicide precautions regardless of placement (safety cells, SITHU, *etc.*).

5.  JPS mental health staff must be trained and held accountable as to their role.

## F. Additional Area for Immediate Remedial Action: Provide Access to Meals, Fluids, Hygiene, Shower, Prescribed Medications, and Toileting to People on Suicide Precautions

An additional area of deficiency in both policy and practice relates to the provision of the most basic of human needs to people on suicide precautions. Recent monitoring reveals shocking denials of water, hygiene, showers, and toileting, all in clear violation of the Consent Decree. *See* Remedial Plan Section H.4.

One class member recently reported that he spent approximately two days on suicide precautions in a Main Jail holding cell that had no toilet or running water.[7] Over the course of those two days, he asked both custody and mental health staff for access to a toilet so that he could defecate. His request was denied each time, with one staff member telling him to defecate on the floor in the corner of the cell. He was ultimately forced to defecate on a paper plate, leading to his getting feces on his feet. He asked repeatedly for water and supplies to clean himself, and was denied. He was forced to eat his lunch that day in this state.

Mr. Hayes's report confirms that these cruel and unacceptable practices persist: "In practice, inmates housed in safety cells continue to not be offered showers, were required to request hydration, and could only defecate into a floor grate." Suicide Prevention Report at 46; *see also id.* at 58 ("Most inmates on suicide precautions either did not receive a shower or rarely, if ever, received a shower."); *id.* at 59 (people held in SITHU were "prohibited from taking a shower" even during multi-day placements).

Progress toward compliance must happen without delay, including as follows:

1.  People on suicide precautions must be offered showers at least daily, and upon reasonable request. Prompt assistance with hygiene and cleaning must be provided whenever circumstances warrant.

2.  People on suicide precautions must be *affirmatively offered* water at least every two hours, and upon request.

3.  People on suicide precautions must be affirmatively offered food at least consistent with normal daily meal provisions, and upon request (*e.g.*, if they missed a meal due to their mental health or suicide observation status).

4.  People held in cell that does not have a toilet must be provided access to a toilet promptly upon request. No one should ever be directed or forced to defecate on the floor or through a grate on the floor.

5.  Health care <u>and</u> custody policies must be revised consistent with the above,

---

[7] We note that the Consent Decree explicitly limits placement in such a cell to six hours. Remedial Plan Section H.1.

making explicit that these requirements apply to people on suicide precautions regardless of placement (safety cells, SITHU cells, *etc*.).[8]

6. JPS staff must be trained and held accountable as to their role.

The persistence of degrading, unnecessary, and harmful deprivations for people in acute mental health distress is intolerable and must be addressed with urgency.

## III.  CONCLUSION

We are deeply disappointed by the lack of progress on key provisions of the Consent Decree relating to mental health care and suicide prevention.  The current system for providing mental health care in Sacramento County's jails is inadequate.  Class members with serious mental health needs are being harmed every day as a result.

Inadequate mental health care in the Jail has been a core element of the parties' negotiations going back five years.  The failure of JPS to present a clear plan for achieving compliance with the Consent Decree, including through program expansion and staff augmentation as necessary, is unacceptable.

Consistent with the Consent Decree's Dispute Resolution process, we request a meeting within the next two weeks, with appropriate County leadership and relevant staff, to discuss these important matters.[9]  Absent a plan for prompt remedial action on these issues, we will proceed to protect the rights and well-being of *Mays* class members through appropriate enforcement action in court.  We look forward to seeing these issues addressed.

Sincerely,

Aaron Fischer                                            Margot Mendelson

Cc:    Hon. Nathanael Cousins
        Mary Perrien, Ph.D., *Mays* Court Expert, Mental Health Care
        Lindsay Hayes, *Mays* Court Expert, Suicide Prevention
        Karen Saylor, M.D, FACP., *Mays* Court Expert, Medical Care
        Madeline L. LaMarre, MN, FNP-BC, *Mays* Court Expert, Medical Care

---

[8] ACH draft Policy 04-08 (Outpatient Program – Suicide Precautions, Observation Levels & Item Restriction) (Draft date: 10/1/21) restates the remedial plan provisions but provides no guidance as to their implementation.  The SSO's draft Suicide Prevention and Intervention policy (Draft date: Sept. 2021) makes no reference to this topic at all.

[9] We are providing a copy of this letter to Judge Cousins, who is designated to assist in dispute resolution processes.

# EXHIBIT B

## MEMORANDUM OF AGREEMENT
Mental Health and Suicide Prevention Remedial Measures Implementation
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)

**Whereas**, Plaintiffs' Class Counsel and Defendant County of Sacramento (the "Parties") reached a settlement agreement in *Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN), with a Consent Decree approved by the Court on January 13, 2020; and

**Whereas**, in the first round monitoring reports (filed Jan. 20, 2021), the *Mays* court-appointed experts found that the County was not in compliance with Mental Health Care and Suicide Prevention provisions of the Consent Decree; and

**Whereas**, to assist the County in the task of implementation, the court-appointed experts identified "focus areas" in the first round monitoring reports – that is, issues that are urgent to class member well-being, are of critical importance to broader compliance efforts, and in many cases would be relatively easy to resolve with sufficient attention; and

**Whereas**, the second round monitoring reports (filed Oct. 4, 2021) documented insufficient progress on the identified "focus areas"; and

**Whereas**, the County is responsible for provision of a Sacramento County Jail ("Jail") Mental Health Care and Suicide Prevention system consistent with legal and constitutional requirements and the Remedial Plan measures set forth in the *Mays* Consent Decree, and as such, must ensure appropriate resources, services, oversight, performance expectations, and consequences for deficiencies in the delivery of Mental Health Care services, including by its contracted provider (UCD Department of Psychiatry & Behavioral Sciences); and

**Whereas**, Class Counsel sent written correspondence (the "Dispute Notice," attached as **Exhibit A**), dated October 29, 2021, demanding that the County take immediate, affirmative steps to implement foundational "focus area" remedial provisions regarding Mental Health Care and Suicide Prevention; and

**Whereas**, consistent with the Dispute Resolution provisions set forth in the Consent Decree, the parties notified by written correspondence the designated Dispute Resolution mediator, the Hon. Nathanael Cousins, about the dispute; and

**Whereas**, the Parties and court-appointed experts on Mental Health Care (Mary Perrien Ph.D.) and Suicide Prevention (Lindsay Hayes) participated in a video conference with Counsel for the Parties as well as representatives from the County Executive, Sheriff's Department, and Adult Correctional Health including Mental Health representatives on November 9, 2021, as part of the Dispute Resolution process; and

**Whereas**, the County provided additional information regarding its response to the issues raised in the Dispute Notice on November 15, November 22, December 6, December 27, 2021, February 8, 2022; and

**Whereas**, the Parties have had several additional communications to discuss specific policy revisions and staff training that are necessary to address "focus area" remedial provisions discussed in Class Counsel's October 29, 2021 Dispute Notice; and

**Whereas**, the Parties agree that Jail population-related stressors impose substantial barriers to implementation of certain "focus area" remedial provisions discussed in Class Counsel's October 29, 2021 Dispute Notice, including as related to inadequate staffing and physical plant deficiencies; and

**Whereas**, the Parties have previously agreed that "population reduction of the jails will facilitate compliance with th[e] Remedial Plan;" and

**Whereas**, the Parties have further agreed that if the "County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available resources to facilitate population reduction;" and

**Whereas**, the County has acknowledged that "there is insufficient staff and space to support requirements within the remedial plan," County Remedial Plan Status Report at 8 of 130 (Dkt. 152, Jan. 20, 2022); and

**Whereas**, Sacramento County is currently overseeing two assessments relevant to Jail population-related and physical plant deficiencies that are barriers to implementation of the Remedial Plan, as follows:

> First, the County is overseeing an assessment of the Sacramento County Main Jail facility and the practicability of implementation of all *Mays* Consent Decree requirements (the "Facilities Report"). This assessment will include an analysis of the maximum incarcerated population that the Main Jail can support while meeting the terms of the Consent Decree;

> Second, the County is overseeing a jail population assessment that will include policy and program recommendations to reduce the incarcerated population through lowering lengths of stay, bookings, and future jail reoccurrence, including through implementation of community programs (the "Jail Population Report"); and

**Whereas**, the findings from these two assessment reports will be publicly available when completed, and will inform the County's efforts towards implementation of the *Mays* Consent Decree;

**Whereas**, the Parties agree that the County currently does not have a plan for reaching compliance with Consent Decree requirements related to the following issues raised in Class Counsel's October 29, 2021 Dispute Notice: (1) remediation of physical plant deficiencies that prevent delivery of adequate health care services; (2) provision of

adequate staffing to deliver adequate mental health care services; (3) provision of adequate acute mental health level of care services at a capacity to meet class member needs; and (4) provision of adequate Intensive Outpatient Program mental health level of care services at a capacity to meet class member needs;

**Now therefore**, the Parties enter into this Memorandum of Agreement with the following terms:

### PROVISIONS RESOLVING ISSUES RAISED IN THE OCTOBER 29, 2021 DISPUTE NOTICE

## MENTAL HEALTH CARE

## Mental Health Treatment Delivery (EOP and Levels of Care System) (Focus Area #3)

1. **Enhanced Outpatient Program (EOP).** The County has implemented and will expand a new Enhanced Outpatient Program (EOP) level of care, to serve more *Mays* class members with serious mental illness. The EOP level of care is designed to reduce disciplinary write-ups, emergent incidents, and need for acute or IOP levels of care. EOP level of care services include regular clinical contact from an assigned case manager, care coordination with treatment partners, mental health treatment planning, crisis intervention, psychoeducation, and increased collaboration with custody to address housing, discipline or other issues that arise. The County will ensure that EOP services are adequate and that EOP capacity is sufficient to meet class member needs consistent with Consent Decree requirements. The Subject Matter Experts will monitor EOP programming, services, and capacity in all future monitoring activities.

2. **Levels of Care System.** The County has revised its mental health levels of care system to align with Consent Decree requirements. It has ceased to utilize, and will not utilize, Frequency of Service Study (FOSS) levels for purposes of the Jail's mental health levels of care system.

   a. The Mental Health Care Subject Matter Expert has found that the historically-used FOSS levels "do not map well onto the acuity of a patient nor onto existing treatment programs," and "do not address treatment planning" or "levels of mental health care which have specific timelines and expectations associated with them" in the Consent Decree.

   b. On December 30, 2021, with input from the Subject Matter Expert and Class Counsel, the County finalized a revised Mental Health Policy No. 04-02, which establishes that "FOSS levels are <u>not</u> used to determine level of [mental health] services of or timelines for care." Instead, "level of and timelines for patient care will be determined by patient needs, clinical assessments, and assigned care location – Acute Psychiatric Unit (APU).

Intensive Outpatient Program (IOP), or Enhanced Outpatient Program (EOP)."

   c. The revised policy clarifies that the Jail may use FOSS levels solely for data collection and analysis purposes.

   d. The County will ensure that the system for assigning appropriate levels of care is accurate, effective, and consistent with Consent Decree requirements. The Subject Matter Experts will monitor this matter in all future monitoring activities.

**Use of Force Policies and Practices, Class Members with Disabilities (Focus Area #4)**

3. On February 4, 2022, the County, with input from the Subject Matter Expert and Class Counsel, completed revision of its Mental Health Policy No. 07-05 regarding Mental Health-Planned Uses of Force policy.

   a. This policy is necessary to implement Remedial Plan requirements to employ de-escalation methods that take into account a class member's mental health or adaptive support needs, utilize mental health staff involvement whenever possible prior to utilizing planned use of force, and requiring video documentation and supervisory review of Use of Force incidents.

   b. Mental health staff will receive de-escalation and use of force training starting in late April/early May 2022, which will include training on relevant *Mays* Consent Decree provisions.

   c. Adequacy of ACH Mental Health Policy No. 07-05 implementation, training and compliance with Consent Decree requirements regarding Use of Force practices will be monitored by the Subject Matter Experts.

4. The County will modify the Sheriff's Office's Operations Order *Use of the WRAP Restraint Device*, including based on input from the Subject Matter Experts and Class Counsel, to ensure compliance with all relevant Remedial Plan provisions. Use of force incidents, including all uses of the WRAP Restraint Device, will be monitored by the Subject Matter Experts.

**SUICIDE PREVENTION**

**Suicide Prevention Policies (Focus Area #1)**

5. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, completed revision of its Suicide Prevention policies (Policy No. 01-15 and 02-05) in September 2021.

    a. Adult Correctional Health provided a two-hour suicide prevention training to health care staff on several dates between December 2021 and February 2022. Training of custody staff rolled out in March 2022.

    b. In February 2022, the County finalized a 4-6 hour suicide prevention training that covers essential aspects of the Remedial Plan as to suicide prevention. The County will utilize a multidisciplinary team to deliver this training to all newly hired mental health, medical, and custody staff. Such training will begin in June 2022 and will be provided on an ongoing basis as staff members are onboarded.

    c. The County will adapt the new-staff suicide prevention training referenced in Paragraph (b), above, to cover all essential suicide prevention aspects of the Remedial Plan, including requirements set forth in this Agreement, to be delivered to all current mental health, medical, and custody staff who have not received the new-staff training. The training was reviewed and approved by the Subject Matter Experts. Training has begun and will continue until all staff members are trained.

6. The County will complete revision of the Sheriff's Office's Suicide Prevention policy, procedure, and training, including based on input from the Subject Matter Experts and Class Counsel, to ensure compliance with all relevant Remedial Plan provisions. The County's Suicide Prevention policies, procedures, and trainings will require the following, with appropriate documentation to show proof of practice:

    a. Staff will offer patients on suicide precautions a shower at least daily, and upon reasonable request.

    b. Staff will provide prompt assistance with hygiene and cleaning to patients on suicide precautions whenever circumstances warrant.

    c. Staff will affirmatively offer patients on suicide precautions water at least every two hours, and upon request.

    d. Staff will affirmatively offer patients on suicide precautions food at least consistent with normal daily meal provisions, and upon request (*e.g.*, if

they missed a meal due to their mental health or suicide observation status).

    e. Staff will provide patients on suicide precautions and held in a cell that does not have a toilet access to a toilet promptly upon request.

**Addressing Overuse and Unnecessary Use of Safety Smocks (Focus Area #2)**

7. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, has finalized revisions to its suicide prevention policies, including to clarify that (a) decisions about the removal of clothing and the issuance of a safety smock to class members on suicide precautions will be under mental health staff authority based on the clinical judgement of a licensed clinician, (b) class members will have clothing restored prior to discharge from suicide precautions and as soon as clinically appropriate while on suicide precautions, and (c) mental health staff will conduct at least daily assessments of a patient's readiness for restoration of clothing and shall document reasons for continued use when indicated.

8. The Sheriff's Department's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding use of safety smocks.

9. Staff compliance with safety smock policies to prevent overuse and/or unnecessary use of safety smocks will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meetings.

    a. Health care and custody supervisors will conduct at least weekly reviews of safety smock use to ensure proper implementation, with corrective action taken when warranted.

    b. The Mental Health and Suicide Prevention Subject Matter Experts will monitor safety smock policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.

**Patient Confidentiality for Suicide Risk Assessments, Mental Health Clinical Encounters (Focus Area #3)**

10. The County has fixed the inoperable telephone inside the designated mental health Interview Room in the Main Jail's intake area, and will take additional steps to improve confidentiality in the Main Jail intake screening area to the greatest extent possible given the deficient physical plant. The Subject Matter Experts will review and assess these modifications on future monitoring visits.

11. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County is utilizing two confidential attorney visit booths on the Main Jail's third floor, to improve confidentiality of mental health appointments. These interim measures, along with other measures to address deficiencies in the confidentiality of mental health contacts, will be reviewed by the Subject Matter Experts during on-site monitoring.

12. As an interim measure to mitigate physical plant deficiencies impacting delivery of care, the County will relocate (i) staff currently using Main Jail office space and (ii) storage space to a nearby off-site location, to free up rooms and the Main Jail 3-West classroom that has been used as office space. These spaces will be repurposed for confidential individual treatment and group therapy for people in the Intensive Outpatient Program or otherwise requiring mental health treatment. The Subject Matter Experts will assess the adequacy of these spaces during upcoming monitoring visits.

13. The County acknowledges that above-identified interim steps will <u>not</u> be sufficient to facilitate full remediation of the legal and constitutional deficiencies identified in the *Mays* case and addressed in the Consent Decree. Issues regarding provision of patient confidentiality for suicide risk assessments and mental health clinical contacts will be addressed through continued Dispute Resolution processes related to physical plant and staffing deficiencies, as set forth on Pages 10-13, below.

**Direct Observation of Class Members on Suicide Precautions (Focus Area #4)**

14. On November 15, 2021, ACH ordered an end to use of Closed Circuit TV (CCTV) for purposes of observing class members on suicide precautions. The Mental Health Medical Director followed up with all psychiatry staff.

15. Adult Correctional Health, with input from the Subject Matter Experts and Class Counsel, finalized Policy No. 02-05 – Suicide Prevention Program on November 16, 2021, which removes CCTV observation and provides for direct observation consistent with Consent Decree requirements.

16. The Subject Matter Experts will evaluate implementation of suicide precaution observation practices during upcoming monitoring visits.

**Appropriate Provision of Privileges and Property for Class Members on Suicide Precautions (Focus Area #5)**

17. Adult Correctional Health shall, with input from the Subject Matter Experts and Class Counsel, finalized revisions to its suicide prevention policies to reflect Remedial Plan requirements regarding privileges and property for patients on suicide precautions. The Sheriff's Office's Suicide Prevention policy and procedure will be revised to align with Adult Correctional Health policy regarding

privileges and property for patients on suicide precautions. These policies specifically shall provide:

a. Mental health staff shall have primary responsibility to determine, based on clinical judgment and on a case-by-case basis and in consultation with custody staff, the provision of:

• Routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise permitted based on a person's classification security level

• Clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise permitted based on a person's classification security level

b. Patients placed on suicide precautions shall be re-evaluated at least daily to assess clinical readiness for personal and jail-issued possessions, clothing, and privileges.

c. Placement on suicide precautions shall *not* preclude patients from receiving timely and regular access to (i) meals, (ii) liquids, (iii) prescribed medication, (iv) toilets, and (v) showers.

d. The County shall ensure full implementation of the requirements as set forth in Paragraph 6, above.

e. Class members on suicide precautions shall be allowed to attend scheduled court proceedings unless the clinician, based upon clinical judgment and in consultation with security staff, determines that transportation to court would adversely impact the individual's condition.

f. The removal of property and/or privileges shall be documented with clinical justification in the patient's medical/mental health record and reviewed on a regular basis. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

g. Cell window coverings shall not be used on cells holding any class member on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need, consistent with Remedial Plan Section VII.J.

i. Placement of a patient in an opposite gender area (*e.g.*, male placed in suicide precautions cell in female intake area) does not constitute a "security need" for purposes of this remedial provision.

    h.  The County will provide tear-resistant mattresses for all patients at the acute level of mental health care, in the SITHU, or on suicide precautions for more than four hours (and consistent with Remedial Plan Section VII.O.1).

18. Staff compliance with the protocols set forth above will be subject to a documented quality assurance process for at least 12 months from the date of this Memorandum of Agreement, with quality assurance review at the monthly Suicide Prevention Subcommittee meeting.

    a.  ACH, mental health, and custody supervisors will conduct at least weekly reviews to ensure proper implementation, with corrective action taken when warranted.

    b.  The Mental Health and Suicide Prevention Subject Matter experts will monitor policy implementation and the quality assurance process to ensure compliance with relevant Consent Decree requirements.


**ISSUES SET FORTH IN THE OCTOBER 29, 2021 DISPUTE NOTICE THAT ARE NOT RESOLVED BY THIS MEMORANDUM OF AGREEMENT AND WILL BE ADDRESSED IN CONTINUED DISPUTE RESOLUTION PROCESSES AND, IF NECESSARY, THROUGH ENFORCEMENT PROCEEDINGS BEFORE THE *MAYS* COURT**

The Parties recognize that the County does not currently have a plan for reaching compliance with Consent Decree requirements related to the following issues set forth in the October 29, 2021 Dispute Notice:

(1) remediation of physical plant deficiencies that prevent delivery of adequate health care services;

(2) provision of adequate staffing to deliver adequate mental health care services;

(3) provision of adequate acute mental health level of care services at a capacity to meet class member needs; and

(4) provision of adequate Intensive Outpatient Program mental health level of care services at a capacity to meet class member needs.

This Memorandum of Agreement thus does not resolve the October 29, 2021 Dispute Notice with respect to these four issues. Rather, this Memorandum of Agreement provides a structure for the County to develop and present its plan and timeline for addressing the systemic deficiencies underlying these four issues. The Parties agree to continue with dispute resolution procedures, as set forth in Consent

Decree Paragraphs 32-34.  Class Counsel retains their right to pursue enforcement proceedings on these issues should dispute resolution procedures not lead to a supplemental memorandum of agreement or stipulation resolving any or all of these four issues.  The parties nonetheless agree to the following:

## MENTAL HEALTH CARE

**Physical Plant Deficiencies Impeding Remedial Plan Implementation (Focus Area #1)**

1. The County does not currently have a plan for remediation of physical plant deficiencies that prevent delivery of adequate health care services, among other essential components of the Remedial Plan (*e.g.*, ADA/Disability accessibility and program access requirements).

2. The County will take interim steps to mitigate physical plant deficiencies that adversely impact mental health care delivery, including as set forth in this Memorandum of Agreement (*e.g.*, *Patient Confidentiality for Suicide Prevention Assessments, Mental Health Clinical Encounters*, Pages 6-7, above).

3. The County will, by no later than December 1, 2022, develop a plan for remedying physical plant deficiencies that impede Consent Decree implementation, with input from relevant community stakeholders.

4. The Parties agree that a plan to remediate physical plant deficiencies must be paired with a plan containing jail population reduction measures, developed with input from relevant community stakeholders, as necessary to facilitate timely, cost-effective implementation of the Consent Decree.  The County will, by no later than October 15, 2022 and with input from relevant community stakeholders, develop a plan for jail population reduction measures, to include funding and an implementation schedule for such measures.

5. Upon completion of the above-referenced plans, the Parties shall meet and confer, with the assistance of the Subject Matter Experts and the designated Dispute Resolution mediator, as appropriate, to discuss the adequacy and timeliness of the plan.  The Parties may then enter into a supplemental memorandum of agreement on the matter or, if a dispute remains, may seek appropriate relief from the *Mays* court.

**Staffing Deficiencies that Impede Remedial Plan Implementation (Focus Area #2)**

6. The County does not currently have a plan for provision of adequate staffing to deliver adequate mental health care services, among other essential components of the Remedial Plan.

7. The Jail's Mental Health leadership was restructured in early December to more effectively complete Remedial Plan work and address mental health program

needs. The Mental Health Program Director position was eliminated and replaced by a Mental Health Manager who oversees two new supervisors, a Clinical Operations Supervisor and an Administrative Operations Supervisor.

8. _Mental Health/Disability Input in the Disciplinary Process_ Requirements. The Parties agree that remedial provisions regarding Mental Health evaluations for the Jail disciplinary process are foundational to Consent Decree implementation, including as to requirements to generally exclude class members with serious mental illness from restrictive housing, to prevent class members from being punished for behavior related to a mental health or intellectual disability, and to avoid disciplinary measures that adversely impact the health and well-being of people with disabilities. Accordingly:

   a. Mental Health Rules Violation Review procedures have been implemented on a limited basis at RCCC and Main Jail, with further mental health staffing allocated in the FY 2022/23 budget for implementation of this remedial plan provision.

   b. The County shall fully implement Mental Health Policy No. 07-06 (Mental Health Rules Violation Review), with appropriate staffing, no later than September 1, 2022.

   c. The County issued a Post Order designating the position of Chief Disciplinary Hearing Officer at each Jail facility in November 2021. The Chief Disciplinary Hearing Officer shall be in charge of reviewing all disciplinary write-ups and ensure consistency in disciplinary practices and procedures, with a primary focus being on issues related to mental health-related issues.

   d. The Subject Matter Experts and Plaintiffs' counsel will monitor Mental Health Rules Violation Review policy implementation and related quality assurance processes to ensure compliance with relevant Consent Decree requirements.

9. _Intensive Outpatient Program_ Requirements. The Parties agree that remedial provisions regarding implementation of the Intensive Outpatient Program (IOP) are foundational to Consent Decree implementation, including as to access to such level of care for class members who have higher security/classification factors, are who are women, and/or who are LGBTQI, as required by Remedial Plan Sections IV.F.4. and VII.F.2.and/or are women. Accordingly:

   a. The County shall, no later than June 1, 2022, activate a new high-security classification female IOP program with a capacity of eight (8) class members who meet IOP criteria.

b. The County shall, no later than September 1, 2022, activate a new high-security classification male IOP program with a capacity of twenty-four (24) class members who meet IOP criteria.

c. The County will continue to assess IOP need among the class member population, including for women, LGBTQI, and/or high-security classification individuals, and will take appropriate steps to provide IOP level of care for those who meet IOP criteria.

10. After Class Counsel sent its Dispute Notice on Mental Health/Suicide Prevention deficiencies, the County completed a staffing analysis that identifies the need for an additional 79 staff members to deliver mental health services at the Jail consistent with the Mental Health Care and Suicide Prevention requirements of the Consent Decree.  The County's analysis acknowledges that prospective jail population "reduction programs could reduce the average daily population and associated staffing needs."  The County will provide staffing plan updates to the Subject Matter Experts and class counsel regularly, and upon request.

11. Upon completion of the above-referenced plans regarding physical plant deficiencies and jail population reduction measures, the Parties shall meet and confer, with the assistance of the Subject Matter Experts and the designated Dispute Resolution mediator, as appropriate, to discuss the adequacy and timeliness of the County's staffing plan.  The Parties may then enter into a supplemental memorandum of agreement on the matter or, if a dispute remains, may seek appropriate relief from the *Mays* court.

**Mental Health Treatment Delivery (Acute and IOP Treatment Programs)**

**Acute Psychiatric Unit (APU) (Focus Area #3)**

12. The County does not currently have a plan for provision of adequate acute level of care mental health services at the Jail.

13. The Subject Matter Experts have found, and the Parties agree, that continued use of the Main Jail 2P unit as the Acute Psychiatric Unit makes impossible provision of acute level of care in an adequate therapeutic milieu with appropriate treatment space, consistent with relevant Consent Decree requirements.  The County will examine all possible methods to deliver acute psychiatric care to *Mays* class members, including in community facilities.

14. No later than June 1, 2022, the County will complete a feasibility analysis regarding the use of alternative space in existing County Jail facilities to provide Acute Psychiatric level of care to class members, to address – in whole or in part – the Jail's current Acute Psychiatric Unit deficiencies – specifically, (1) the lack of

adequate group therapy, (2) the lack of confidential individual treatment space, and (3) the persistent waitlist for admission.

15. Upon completion of the feasibility analysis, the Parties shall meet and confer, with the assistance of the Subject Matter Experts and the designated Dispute Resolution mediator, as appropriate, to discuss the County's plan to provide acute level of care to meet class member patient need, including with an adequate therapeutic milieu and appropriate treatment space, consistent with relevant Consent Decree requirements. The Parties may then enter into a supplemental memorandum of agreement on the matter or, if a dispute remains, may seek appropriate relief from the *Mays* court.

16. The County will discontinue use of beds with attachment points of any kind (including the existing beds with "handles" designed for restraint brackets) for Acute Psychiatric Unit (APU) patients.

   a. As soon as feasible, and in any case no later than September 30, 2022, the County will safely eliminate the "handles" from at least 16 of the 17 existing Acute Psychiatric Unit patient rooms in the Main Jail 2P unit. If the County chooses to retain one Main Jail 2P APU room with restraint brackets, it will ensure that no patient who is "danger-to-self" or at risk of suicide is held in that room (except in cases where clinical restraints are being applied).

   b. As part of the County's forthcoming plan to discontinue the Main Jail 2P unit as the APU, the County will ensure that *all* new APU beds are suicide-resistant and free of attachment points. The County may elect to install an anti-ligature restraint bed in the APU, after conferring with class counsel and the Subject Matter Experts to ensure appropriate measures against suicide.

**Intensive Outpatient Program (IOP)**

17. The County does not currently have a plan for provision of adequate IOP level of care mental health services at the Jail.

18. The County will produce a plan, by no later than July 1, 2022, to timely address IOP deficiencies – specifically, (1) the lack of treatment space for group therapy, structured activities, and confidential clinical contacts, and (2) the current lack of program capacity to meet the need. The County's plan shall include necessary steps (consistent with Paragraph 9, above) to ensure access to this level of care to class members who are women, are LGBTQI, and/or have higher security/classification factors, as required by Remedial Plan Sections IV.F.4. and VII.F.2.

**MEMORANDUM OF AGREEMENT**
**Mental Health Care & Suicide Prevention – Core Remedial Plan Measures**
*Mays v. County of Sacramento* (Case No. 2:18-cv-02081-TLN-KJN)

19. Upon completion of the plan, the Parties shall meet and confer, with the assistance
    of the Subject Matter Experts and the designated Dispute Resolution mediator, as
    appropriate, to discuss the adequacy and timeliness of the plan.  The Parties may
    then enter into a supplemental memorandum of agreement on the matter or, if a
    dispute remains, may seek appropriate relief from the *Mays* court.

**CONCLUSION**

The provisions of this Memorandum of Agreement are designed to ensure
compliance with the terms of the Remedial Plan in the *Mays* Consent Decree.  The
Parties agree that the relief contained herein is narrowly drawn, extends no further than
necessary to ensure the protection of the federal rights of *Mays* class members, and is the
least intrusive means necessary to accomplish those objectives.

The terms of this Memorandum of Agreement are subject to the monitoring and
enforcement provisions set forth in the *Mays* Consent Decree.

This Agreement shall be deemed fully executed and effective when all Parties
have executed it by signature.


Dated:  May 27, 2022

Aaron Fischer
Attorney for Plaintiffs


Dated:  May 27, 2022

Margot Mendelson
Attorney for Plaintiffs


Dated:  May 27, 2022

Sacramento County Counsel
Attorney for Defendant


Page **14** of **14**

**EXHIBIT B  Page 38 of 48**

# EXHIBIT C



**PRISON LAW OFFICE**



April 15, 2022

Rick Heyer
Supervising Deputy County Counsel
County of Sacramento

Ann Edwards
County Executive
County of Sacramento

Eric Jones
Deputy CEO
County of Sacramento

Re:   Termination of Contract for Federal Detainees in the Sacramento County Jails
      *Mays v. County of Sacramento*

Dear Mr. Jones, Ms. Edwards, and Mr. Heyer:

      As class counsel in *Mays v. Sacramento*, we write to call on Sacramento County to end its contract to house federal detainees in the Sacramento County Jails.  At present, the County is housing over 300 federal detainees in its aging, overcrowded jails.  Despite a federal court Consent Decree with clear requirements to address serious, longstanding deficiencies, the County has proven unable to provide safe and humane conditions of confinement for the people it incarcerates.  The contract with the U.S. Marshals expires in May 2022, and the County must not renew it.  Continuing to detain hundreds of federal detainees in the jails renders compliance with the *Mays* Consent Decree impossible and cannot be justified given the dangerous and harmful conditions in the Sacramento County Jails.

      After years of negotiation, the *Mays* Consent Decree was approved by a federal court in January 2020.  The Consent Decree governs mental health care, medical care, suicide prevention, ADA compliance, and practices regarding the use of force, discipline, and solitary confinement. It sets minimum standards regarding the manner in which the County can incarcerate the people in its custody.  It requires the County to provide adequate medical and mental health care and facilities that are accessible to people with disabilities.  The Consent Decree prevents the County from punishing people for behavior that results from their mental health needs or subjecting them to harmful isolation.  It requires the County to provide sufficient medical, mental health, and custody staffing to ensure that the basic needs of the population are met.

      Since the approval of the Consent Decree, despite the efforts of many, the County has failed to implement it.  Many of the core provisions of the Consent Decree remain distant promises.  Court-appointed experts in mental health, medical care, and suicide provision have repeatedly found that the County is failing to comply with key principles and provisions of the Consent Decree.

Ending the Contract for Federal Detainees in the Sacramento County Jails
*Mays v. County of Sacramento*
April 15, 2022

For years, the jails have lacked sufficient nurses and doctors to respond promptly to requests for medical care. Medications are administered inconsistently, and health care staffing is inadequate to provide timely access even to critical health care functions. The County is failing to meet basic standards of care for people in the jails with chronic, serious conditions like diabetes and HIV.

The County reports that it is unable to hire or retain enough health care providers to meet the needs of the jail population. Even if it could, there is not enough office space in the aging jail facilities for the number of staff needed. The jails also lack private space to conduct physical examinations. There are not enough exam rooms in the jail to provide timely medical care. Intake nurses evaluate people who enter the jail in a tiny, crowded, cluttered room where confidentiality is impossible.

People in the jails who need acute mental health care are placed on long waitlists, sometimes waiting for days in small windowless concrete cells with grates on the floor to serve as toilets. There are not enough suicide-resistant cells to house the number of people in the jails experiencing suicidal ideation, so the Sacramento Sheriff's Office (SSO) has created makeshift housing space for people in psychiatric crisis that consists of cots encircled by cones in the dayroom of a regular jail housing unit.

In recent months, housing placements in the jails are so scarce that people are forced to spend up to 24 hours and sometimes more in the filthy, crowded booking loop in the Main Jail when they enter the jail. They are crowded into holding tanks where they sleep on hard benches or thin mattresses on the floor while jail officials wait for a cell to open up in the jail. People have experienced dangerous periods of severe withdrawal from substance use while unmonitored by medical staff.

These conditions are unacceptable, unconscionable, and unlawful. By all accounts, the key cause of these chronic failures is overcrowding. The population of the jail outstrips its capacity in every regard. The jails simply lack the housing space, clinical space, office space, health care staff, and custody staff to meet the needs of the current jail population.

Eliminating the contract with the U.S. Marshals is an essential step toward addressing these chronic shortages. Federal detainees often spend very long periods of time in the jails due to the complex nature of their charges. Like all people in the jails, many require mental health and medical care services, and have disabilities that must be accommodated. Of the 318 federal detainees currently in the custody of the Sacramento Sheriff's Office, all but five are housed in the overcrowded Main Jail. Over 44% of them require mental health services from the jails' overstretched and failing jail mental health program. About a dozen are housed in the Main Jail's overcrowded high-security housing unit, where population pressures have caused ongoing violations of the Consent Decree provisions governing solitary confinement. The incarceration of this population requires enormous resources and will only serve to prolong the *Mays* case and even lead to further costly litigation to enforce the Consent Decree.

Page 2 of 3

Ending the Contract for Federal Detainees in the Sacramento County Jails
*Mays v. County of Sacramento*
April 15, 2022

Members of the Board of Supervisors have expressed interest in reducing the jail population in order to comply with the County's legal obligations, including to minimize the need for extensive construction. Eliminating the contract with the U.S. Marshals Service will not go far enough to address the County's legal obligations, but it is an essential step along the way. It represents an opportunity to substantially reduce the jail population without even a minimal effect on public safety.

The costs of complying with the *Mays* Consent Decree at the jails' current population levels are tremendous. The jails are vastly understaffed to meet the most basic needs of the population, and the shortage of clinical, office, and housing space to serve the current population is dire. Ceasing to house hundreds of federal detainees in the jails would have a meaningful impact on the operations of the jails, reduce the strain on the physical space, and ameliorate staffing deficits. It is a step towards giving the County, including jail staff and leadership, the chance to succeed in *Mays* Consent Decree implementation and more broadly.

There is no justification for continuing to house federal detainees in the Sacramento County Jails when the County has demonstrated that it cannot lawfully manage its jail population. The time has come to eliminate the County's contract with the U.S. Marshals Service. Please let us know if you have questions or would like to discuss this important matter.


Sincerely,

*Margot Mendelson*                 *Aaron Fischer*
Margot Mendelson                    Aaron Fischer
Patrick Booth                       LAW OFFICE OF AARON J. FISCHER
PRISON LAW OFFICE


cc:    Sacramento County Board of Supervisors
       Lisa Travis, County Counsel

Page 3 of 3

# EXHIBIT D



**PRISON LAW OFFICE**



March 1, 2022

Rick Heyer
Supervising Deputy County Counsel
County of Sacramento

Ann Edwards
County Executive
County of Sacramento

Eric Jones
Deputy CEO
County of Sacramento

Matthew Petersen
Chief Deputy, Correctional Services
Sacramento County Sheriff's Office

Sandy Damiano
Director
Adult Correctional Health

Dear Mr. Heyer, Ms. Edwards, Mr. Jones, Ms. Damiano, and Chief Petersen:

We write to bring your attention to dangerous and degrading conditions of confinement in the Sacramento County Main Jail and to call for urgent remedial action.

As class counsel in *Mays v. Sacramento* we recently became aware that due to ongoing jail overcrowding, the Sacramento Sheriff's Office (SSO) has been unable to move people from the booking loop to the housing units in a timely manner. The return to pre-pandemic population levels, even as pandemic-related quarantine safety protocols persist and strain the Main Jail's facility management, has led to a horrifying and dangerous situation for *Mays* class members. Rather than being processed expeditiously following arrival at the jail, dozens of people are spending several days at a time sleeping on concrete floors in filthy, below-ground holding cells that are not intended for human habitation. While there, they are denied basic medical and mental health care, even while experiencing serious mental health needs or active withdrawal from substance use. Just two weeks ago, a man with alcohol substance use disorder died on his third day in the booking loop.

These conditions are unlawful and result directly from unacceptably high population levels in the Jail. As outlined in this letter, the SSO is failing to provide safe and humane conditions of confinement at current population levels, and the County must act with haste to redress the situation by reducing the jail population and enhancing health care services for those who remain in the jail.

**d                              r**

People in the jail are being held in windowless, basement holding cells for multiple days after they arrive at the jail. The holding cells are freezing cold and filthy, with used toilet paper, old utensils, and used undergarments crumpled on the floor. People booked into the jail reported

Immediate Action to Address Dangerous and Inhumane Conditions, Main Jail Booking Loop
*Mays v. County of Sacramento*
March 1, 2022

that they are issued a single set of outer garments, including just one short sleeve shirt. One woman described sleeping for three nights on a concrete floor wedged between two dirty mattresses to stay warm. Others reported sleeping on the freezing concrete floor with no mattress or blanket in a crowded holding cell shared with as many as 20 people.

People report that the holding cells reek of feces and vomit. Many of the people in the holding cells are experiencing withdrawal from alcohol and other substances. They report that they vomited and defecated repeatedly for days as their bodies suffered through withdrawal. One woman reported that so many people in the holding cell were vomiting that they had to use cups to hold their vomit until the toilet was available. The toilets have flushing restrictions, so feces and vomit pile up in the toilet. No one is permitted to shower while held in the booking loop holding cells.

There are no books, no television, no radio, and no writing materials available to people in the booking loop holding cells. Many people report that they simply stared at the concrete floor and walls for hours waiting for the time to pass. Several people reported that deputies failed to provide some meals while they were in the booking loop. People told us that they were treated  like animals  when they asked the deputies passing by how long they would remain in the holding cells or how they could access the health care services they needed. One woman reported that the deputies told her there was simply no space for her in the jail, so she would remain in the crowded holding cell until a space opened up in the jail's regular housing units.

There is no justification for these degrading and dangerous conditions. With essential COVID protocols bumping into the nearly highest jail population levels since the early days of the pandemic, the crowding and excessive lengths of stays in the booking loop has made the situation dire. Immediate remedial action is necessary.

### M d        r

People in the booking loop holding cells are not receiving necessary medical or mental health care, regardless of their repeated requests. This dangerous situation is the consequence of serious health care staffing deficits that have become even more acute recently, the lack of minimally adequate space in the booking loop to deliver basic health care, and the overcrowding-driven bottleneck that keeps people in the booking loop for many days at a time.

In one case, a man with serious mental health needs reported that he asked custody staff  at least ten times a day  if he could see mental health staff. He repeatedly informed them that he needed medication to treat his psychiatric condition. Rather than facilitate access to care, custody staff in the booking loop reportedly told him that it was not their job to schedule mental health appointments for him.

In another instance, confirmed by the Jail's own medical records, a woman reported to jail officials at the time of booking that she had significant quantities of heroin and methamphetamines in her system. The intake nurse informed her that she would be monitored and would receive intake medications within 24-48 hours. Instead, the woman was placed into a holding cell in the booking loop for three days. During that time, she was sweating, vomiting, and defecating constantly. She reports that her bones were aching and she wanted to crawl out of her skin. Medical records confirm her report that she did not see a nurse or other health care staff once during that period of time. Instead, she went through severe withdrawal with no medical

Case 2:18-cv-02081-TLN-KJN Document 14-15 Filed 06/06/23 Page 63 of 67
Immediate Action to Address Dangerous and Inhumane Conditions, Main Jail Booking Loop
*Mays v. County of Sacramento*
March 1, 2022

supervision or monitoring. She reported that three other women in the holding cell were experiencing severe withdrawal symptoms as well.

The stakes of these failures are profound. A man in his late thirties died earlier this month in the Main Jail booking loop. While the official cause of death has yet to be determined, medical records indicate that he reported a significant ongoing alcohol substance use disorder at the time of intake. Despite knowledge of this condition, no health care staff member documented any assessment of the patient for days. He remained in the booking loop without any documented medical attention until he died two days later in a holding cell, under circumstances consistent with untreated alcohol withdrawal.

Even before the recent overcrowding-driven reliance on the booking loop for housing, the court-appointed medical experts in this case reported that the County is failing to adequately monitor or treat people going through substance use withdrawal. They noted that untreated or inadequately treated substance abuse withdrawal predictably results in preventable suffering, and patients are at risk of hospitalizations and death. Madeleine LaMarre aren Saylor, Monitoring Report of the Medical Consent Decree (Oct. 4, 2021), ECF No. 14 -1 at 11. They criticized the use of the booking loop for monitoring substance use withdrawal, noting that it is completely unacceptable, dirty, and dehumanizing. *d*. at 18. The failure to adequately treat this high-risk population is patently unlawful. *See* Consent Decree, Sec. VI.A, C, N (requiring sufficient healthcare staffing, ready access to health care, regular nursing assessments for people experiencing detoxification in the first five days, and the provision of medication interventions to treat withdrawal syndromes).

It is difficult to imagine a more dangerous situation. Staffing deficits and population challenges do not justify the failure to provide basic, life-saving care to people who are in an exceptionally high-risk state.

**d**                                          **r**

The County must act to remedy these conditions immediately. In particular, the County must take the corrective actions outlined below.

*Medical Care for ersons at is of ithdra al from Alcohol en odia e ines and iates*

With respect to the severe deficits in the provision of care to people experiencing withdrawal from substances, Plaintiffs' counsel demands the following:

(1) The County must provide 24 nursing staffing to the booking loop. Nurses must make regular rounds of all holding cells in which people are being held and must be readily available to people who need care. If the current staffing resources available to the Jail are not sufficient to meet this nursing demand, the County must redeploy resources immediately.

(2) Because the County has demonstrated its inability to comply with basic protocols regarding monitoring people who are experiencing detox, it must revise its policies to initiate the detoxification regimen for all patients with alcohol, benzodiazepine, and opiate substance use disorder, independent of CIWA and COWS score at intake. A first dose of medication should be administered while the patient is in booking. Nurses must conduct a CIWA and or COWS assessment within hours of intake.

Case 2:18-cv-02081-TLN-KJN Document 114-15 Filed 06/06/22 Page 64 of 76
Immediate Action to Address Dangerous and Inhumane Conditions, Main Jail Booking Loop
*Mays v. County of Sacramento*
March 1, 2022

(3) A medical provider must evaluate all persons with substance use disorder within 24 hours of arrival at the Jail.

(4) Nurses must monitor persons with substance abuse disorder according to the severity of withdrawal and in accordance with the Standardized Nursing Procedure.

(5) Nurses must identify and use dedicated space in the booking loop or elsewhere in the jail to do assessments of people who are experiencing detox.

( ) The County must produce within  0 days a plan to expeditiously establish a dedicated detox monitoring unit in the Main Jail.

( ) The County must develop a quality assurance system to review its practices with respect to detoxification, including through sampling medical charts of patients who are identified as having substance use disorder at intake. The County must generate a monthly report on its findings, to be provided to Plaintiffs' counsel and the court-appointed medical experts.

(8) The County must produce a monthly report of all people who are identified as: (a) having substance use disorder, and or (b) experiencing detox at the time of intake so that Plaintiffs' counsel and the court-appointed medical experts can independently monitor compliance with detoxification protocols.

If the County is unable to produce a plan to address these deficits with urgency, Plaintiffs' counsel will invoke the court to enforce our clients' rights to life-saving medical care. We and the court-appointed medical experts are available to discuss these demands and a plan for implementation.

*oo ing  oo  Conditions and  o ulation  ressures*

As noted, the dangerous situation in the Jail is a direct result of unacceptably high population levels. As of February 25, 2022, the overall census of the Sacramento County Jail was 3,3  . This stands in contrast to the total population of 2,500 in the summer of 2020. With the ongoing need to maintain quarantine and isolation units to protect people from transmission of COVID-1  and significant, persistent staff shortages in custody and health care, the Jail simply cannot safely and humanely house a population of this magnitude. *See* Ltr. from A. Fischer    M. Mendelson, Demand for Action to Combat COVID-Omicron Surge (Jan. 13, 2022).

To address this situation, the SSO should take the following measures:

(1)   **r r     r r**    The SSO has reinstated its policy of releasing people with  0 days or less remaining on their sentences. This is a welcome development, and to our understanding has led to the early releases of more than 300 people. But with the high booking rates and enormous backlogs in criminal courts, the  0-day early release policy does not go far enough to address the magnitude of the crisis. The SSO must act promptly to expand its release plan, for example by releasing people who meet certain criteria with less than 180 or 2  0 days remaining on their sentence.

Page 4 of 5

Immediate Action to Address Dangerous and Inhumane Conditions, Main Jail Booking Loop
*Mays v. County of Sacramento*
March 1, 2022

(2)    r    r    The Sheriff's January 13, 2022 letter to the County's local law
enforcement agencies on  COVID-1  Related Arrestee Booking Temporary
Restrictions  appears, based on the County's data, to have had little to no effect on
the number of new arrivals coming into the jail's booking loop.  The Sheriff's Office
should further narrow its criteria for accepting new bookings  for example, by
considering all arriving individuals for immediate diversion rather than booking,
consistent with the emergency  zero bail  policy that was in effect earlier in the
pandemic.

(3)           r    The Sheriff's Office, with its community partners and sister
agencies, achieved substantial population reduction in the early months of the
pandemic. These efforts undoubtedly mitigated the level of COVID-1  infections and
adverse health outcomes for people incarcerated in the jail system. The Sheriff retains
its authorities, including pursuant to  overnment Code section 8 58, to reduce the
jail population to address an emergency situation endangering the lives of
incarcerated people, as we see today in the booking loop and throughout the jail
system. The Sheriff must exercise this authority to prevent suffering and deaths.

(4)                : As a backstop to prevent the conditions present today, the SSO
should institute a firm cap on the number of people who can be held in the booking
loop. The booking area was not designed for human habitation and may not serve as a
*de facto* housing unit. Plaintiffs' counsel is available to discuss a specific cap on the
booking loop occupancy and the procedures for its implementation.

As class counsel, we are cognizant of the particular challenges facing jail administrators
at this time and aware of the hard work of the jail staff and leadership to meet the needs of
people in the jail. Nonetheless, the time has come for a more robust response to the unacceptable
conditions in the Sacramento County Jail. We request a written response from the County on this
important matter no later than March 8, 2022.

Sincerely,

 s  Margot Mendelson                     s  Aaron Fischer
Margot Mendelson                 Aaron Fischer
Patrick Booth                                      r           r
 r

cc:    Madeleine LaMarre, Court-Appointed Expert, Medical Care
    aren Saylor, Court-Appointed Expert, Medical Care
    Lindsay Hayes, Court-Appointed Expert, Suicide Prevention
    Mary Perrien, Court-Appointed Expert, Mental Health Care

Page 5 of 5

# EXHIBIT C Placeholder

Exhibit filed under seal

# EXHIBIT D Placeholder

Exhibit Filed Under Seal